UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *EX REL.* CYNTHIA I. FITZGERALD, <br><br>     AND <br><br> STATE OF TEXAS *EX REL*. CYNTHIA I. FITZGERALD, <br><br>                            Plaintiffs, <br><br>     v. <br><br> NOVATION, LLC, VHA, INC., BECTON DICKINSON & CO., and HERITAGE BAG COMPANY, <br><br>                           Defendants. | No. 3 03 CV 1589N <br><br> SECOND AMENDED COMPLAINT FOR VIOLATION OF FEDERAL FALSE CLAIMS ACT AND TEXAS MEDICAID FRAUD PREVENTION ACT |

# TABLE OF CONTENTS

**PAGE**

I.     INTRODUCTION ...............................................................................1

II.    PARTIES .........................................................................................6

III.   UNNAMED CO-CONSPIRATORS .................................................11

IV.    JURISDICTION AND VENUE ......................................................13

V.     FEDERAL AND STATE HEALTHCARE PROGRAMS ..................14

       A.    The Medicare Program ....................................................14

       B.    The Medicaid Program ....................................................17

       C.    The TRICARE/CHAMPUS Program ................................18

VI.    BACKGROUND ON GROUP PURCHASING ORGANIZATIONS ...........................20

VII.   THE ANTI-KICKBACK ACT AND "SAFE HARBOR" ................21

VIII.  DEFENDANTS' FRAUDULENT SCHEMES ................................23

       A.    Up-Front Payments to "Buy the Contracts"..................26

             1.    Johnson & Johnson's offer to buy the IV Catheter Contract ....................26

             2.    Becton Dickinson's $100,000 "Donation" to Novation in
                   connection with winning the IV Catheter Contract .................28

             3.    Becton Dickinson's payment in connection with winning
                   the Needle Contract..................................................30

             4.    Vendor guarantees of revenue regardless of sales of their
                   products..................................................................31

       B.    "Administrative/Marketing Fees" ..................................32

             1.    Major pharmaceutical manufacturers pay Novation some of
                   the highest "administrative/marketing fees"................33

             2.    Other excessive "administrative/marketing fees" paid by
                   Becton Dickinson and Heritage Bag................................34

             3.    Remuneration received by Novation and VHA from vendors
                   selling goods to hospitals participating in incentive programs.................36

             4.    Novation's preference for higher priced goods because they
                   serve to increase its "administrative/marketing fees"................38

001857-11 210769 V1

C.      Payments for Products Offered Under Novation's Private Label Brand, "NOVAPLUS®" .........................................................................39

D.      Novation's Failure to Disclose Excessive Fees to Hospital Members and Customers..............................................................................45

IX.    DAMAGES...............................................................................................46

A.      Inflating Costs of Supplies Reimbursed by Government Health Insurance Programs...........................................................................46

B.      Specific Examples of Inflated Costs of Supplies Reimbursed by Government Health Insurance Programs ...............................................50

X.     EMPLOYMENT DISCRIMINATION FOR ACTS IN FURTHERANCE OF FALSE CLAIMS ACT ACTION ...............................................................54

XI.    COUNTS..................................................................................................56

COUNT I  Substantive Violations of the Federal False Claims Act [31 U.S.C. §§ 3729(a)(1), (a)(2), (a)(7) and 3732(b)] ..........................................56

COUNT II  Federal False Claims Act Conspiracy [31 U.S.C. §§ 3729(a)(3) and 3732(b)]...................................................................58

COUNT III  Substantive Violations of the Texas Medicaid Fraud Prevention Act [Texas Human Resources Code §§ 36.002 (1)(A), (2)(B) & (4)(B)] ...................59

COUNT IV  Texas Medicaid Fraud Prevention Act Conspiracy  [Tex. Human Resources Code § 36.002(9)]..................................................................60

COUNT V  Federal False Claims Act – Employment Discrimination [31 U.S.C. § 3730(h)] ...............................................................................61

COUNT VI  Texas Medicaid Fraud Prevention Act – Employment Discrimination [Texas Human Resources Code § 36.115].............................................................62

PRAYER....................................................................................................................62

JURY DEMAND ......................................................................................................63

001857-11  210769 V1

# I.     INTRODUCTION

1.     This is an action to recover damages and civil penalties on behalf of the United States of America and the State of Texas arising from false statements and claims made, presented, and caused to be presented by the defendants and/or their agents, employees and co-conspirators in violation of the Federal Civil False Claims Act, 31 U.S.C. §§ 3729 *et seq*., as amended ("the Federal FCA"), and the Texas Medicaid Fraud Prevention Act, Texas Human Resources Code §§ 36.001 *et seq*. ("the Texas MFPA").

2.     The Federal FCA provides that any person who knowingly submits or causes to be submitted a false or fraudulent claim to the government[1] for payment or approval is liable for a civil penalty of up to $11,000 for each such claim submitted or paid, plus three times the amount of the damages sustained by the government.  The Texas MFPA similarly provides for civil penalties of up to $10,000 for each false claim and civil remedies of three times the amounts paid as a result of the false claims.  Liability attaches both when a defendant knowingly seeks payment that is unwarranted from the government and when false records or statements are knowingly created or caused to be used to conceal, avoid or decrease an obligation to pay or transmit money to the government.  The Federal FCA and Texas MFPA each allow any person having information regarding a false or fraudulent claim against the government to bring an action for herself (the "relator" or "*qui tam* plaintiff") and for the government and to share in any recovery.  The Complaint is filed under seal for at least 60 days (without service on the defendants during that period) to enable the government:  (a) to conduct its own investigation without the defendants' knowledge, and (b) to determine whether to join the action.

3.     Defendant VHA, Inc. ("VHA") is a hospital network consisting of 2,200 community-owned hospitals.  Defendant Novation, and its predecessor VHA Supply Company (collectively "Novation"), are group purchasing organizations that provide purchasing services to the members of VHA and another large network of hospitals, University Health Consortium ("UHC").  HealthCare Purchasing Partners International, LLC ("HPPI") is a group purchasing

---

[1] As used herein, the term "government" shall refer to both the federal government and the government of the State of Texas.

organization affiliated with Novation that markets Novation purchasing agreements to healthcare providers that are ***not*** members of VHA or UHC.  Novation and HPPI will be referred to collectively as "the GPOs," and the hospitals and other providers that purchased items under contracts negotiated by Novation (whether through Novation or HPPI) will be referred to as "Novation's Customers."  Defendants Becton Dickinson & Co. and Heritage Bag Company (collectively, the "Vendor Defendants"), manufacture medicines and medical-related supplies that are purchased for Novation's Customers through Novation and HPPI.

4.      At all times relevant to this Complaint, meaning from 1993 to present, the member hospitals of VHA and UHC, as well as non-member providers, purchased, through Novation and HPPI, medicines and supplies that were used in providing medical care to beneficiaries of state and federally-funded health insurance programs.  Those providers sought reimbursement for the cost of these supplies and services from the government health insurance programs, including Medicare, Medicaid, and TRICARE/CHAMPUS.  Medicare is a federally-funded health insurance program primarily for the elderly.  Medicaid is a state and federally-funded health insurance program for low-income patients.  In Texas, the Medicaid program – known as the Texas Medicaid Program – is funded with 60% federal funds and 40% state funds. The Civilian Health And Medical Program of the Uniformed Services, now known as TRICARE ("TRICARE/CHAMPUS"), is a federally-funded health insurance program for individuals with family affiliations to the military services.

5.      At all times relevant to this Complaint, Novation was in the business of securing, on behalf of the Novation Customers, group contracts with manufacturers, suppliers, and distributors (collectively "vendors"[2]) for supplies and services.  The Novation Customers purchase more than $25 billion in supplies and services annually under Novation's group contracts and collectively comprised 27% of the national market of staffed beds, 31% of total admissions, and 29% of total surgeries.  Accordingly, Novation wields considerable power in

---

[2] As used herein, the term "vendor" shall refer to manufacturers, distributors, and/or suppliers.

determining which manufacturer will be awarded one of its more than 600 group contracts and which distributors will be authorized to distribute products under these contracts.

6.     At all times relevant to this Complaint, defendant Novation, with the assistance of VHA, used this power to secure kickbacks and other illegal remuneration from the vendors as payment for awarding them coveted Novation contracts.  For their part, the Vendor Defendants and other unnamed co-conspirators offered and/or agreed to pay illegal kickbacks and other remuneration in exchange for obtaining those contracts.

7.     At all times relevant to this Complaint, despite Novation's touted mission of achieving *cost savings* for VHA's and UHC's Members, an important business objective of Novation was *increasing* its own annual revenue.  To do this, Novation (and VHA before it) solicited payments from bidders on hospital supply contracts, separate and apart from the price offered by the bidders for their goods or services.  Novation then awarded contracts to the bidders based at least in part on their having offered it the highest fees and other secret forms of remuneration.  Because government health programs reimburse Novation's customers for a substantial portion of their costs of goods and services, the supplies and services Novation's customers procured pursuant to contracts infected by these kickbacks were paid for in part by the government.

8.     The Anti-Kickback Act prohibits any entity from soliciting or paying remuneration in exchange for the referral or recommendation of goods or services reimbursed by government health programs.  42 U.S.C. § 1320a-7b(b).  The government will not reimburse providers for goods or services that were supplied in a manner tainted by a kickback.  Consequently, a claim for government reimbursement for goods or services infected by a kickback is deemed false under the Federal FCA and the Texas MFPA.  Under these statutes, the parties to the kickback relationship are deemed to have caused the false claim for reimbursement.  Thus, both the entity that solicited and the entity that paid such kickbacks are liable for the false claim for reimbursement.

9.      Congress has exempted certain innocuous payments that technically fall within the proscription of the Anti-Kickback Act by creating so-called safe harbors. One such safe harbor is for **reasonable** administrative fees collected by GPOs from vendors, fees that otherwise would be borne by hospital customers and, ultimately, the government. Congress recognized, however, that "only reasonable and above-board vendor-paid GPO fee arrangements receive the protection of [the] exclusion." H. Conf. Rep. 1012, 99th Cong., 2d Sess. 310-11 (1986). Fees that are disguised payments for access to government-reimbursed markets for vendors' products, and that bear no connection to the GPOs' administrative costs, are not immunized by the safe harbor. Congress declared that payments "in excess of 3 percent" signaled "possible abuse." *Id.* The Inspector General of the U.S. Department of Health and Human Services, in implementing this safe harbor, imposed additional disclosure and reporting obligations on GPOs that solicit payments from vendors to qualify for the safe harbor. 42 C.F.R. § 1001.952(j).

10.     The payments from vendors demanded by Novation, and VHA before it, in exchange for contract awards did not meet the requirements of the safe harbor provision. These payments bore no relation to Novation's administrative costs and instead were made solely to buy access to the highly lucrative government-reimbursed markets that Novation controlled. The remuneration paid to Novation often far exceeded the 3% ceiling that Congress and the Inspector General used to help mark the line between reasonable administrative costs and abusive pay-offs. Nor did Novation comply with the disclosure and reporting obligations required to qualify for the safe harbor. Bereft of the safe harbor, the vendors' payments to Novation constituted kickbacks prohibited by federal law. Under the Federal FCA and the Texas MFPA, Defendants are liable for the false claims for government reimbursement of the cost of supplies and services that were procured through these kickback-tainted contracts.

11.     *Qui Tam* Plaintiff/Relator Cynthia I. Fitzgerald ("Relator") worked for Novation in 1998 and 1999. In one of her first experiences with Novation, Relator was asked point blank by a Johnson & Johnson sales representative "how much will it take" to get a contract for IV Catheters and Start Kits. He told her this was how it worked at Novation. She reported her

concerns and Novation, instead of disqualifying Johnson & Johnson, forced her out of her job. *See infra* ¶¶ 105-112. Before she was fired, another sales representative from Becton Dickinson told her that Becton was "buying" a lucrative needle contract by making a large cash payment to Novation. *See infra* at ¶¶ 119-121. At a dinner during the course of another bid process, a representative from Heritage Bag Company, which was the longstanding incumbent, demanded that Relator tell him what its competitors were bidding and when she refused said he would "take care of her." *See infra* at ¶ 164.

12.     The kickbacks at issue, as described below, include a $100,000 "donation" paid by winning bidder Becton Dickinson on a different contract. *See infra* ¶¶ 114-118. Novation's form Invitations for Bids encouraged bidders to offer it fees (separate and apart from the prices of their products) and told them their bids would be evaluated based in part on the size of the fee. As a result, in 1999, on 31% of Novation's 600 contracts vendors paid Novation fees in excess of 3% – and some as high as 30% – to access the lucrative markets it controlled. *See infra* ¶¶ 127-128. These payoffs/kickbacks had no connection to Novation's administrative costs in managing the contracts, were not disclosed to Novation's customers, and were not protected by the safe harbor. On two contracts in which Relator was involved, Becton Dickinson paid Novation a 9% fee and Heritage Bag Company an 8.19% fee. *See infra* ¶¶ 130-140. Novation developed its own NOVAPLUS® label for its customers. It convinced vendors to market their products under the NOVAPLUS® label by offering to increase the retail price and splitting the increased profits with them. *See infra* ¶¶ 155-170. Novation did not inform its customers of this collusive arrangement or the higher prices, so the safe harbor does not apply. Under this type of arrangement, Heritage Bag secured consecutive contracts with Novation for more than 10 years despite the availability of lower-priced competing products. As a result of these illegal practices, Novation's customers and the government paid higher prices while Novation secretly pocketed high fees.

13.     Defendants engaged in these fraudulent practices knowing that such payments would inflate the costs of the contracted supplies that the Novation Customers purchased and

would ultimately cause them to submit to the government health insurance programs – in their invoices and annual cost reports – claims for reimbursement for supplies and services that were higher than they would have been had Novation not solicited and received these illegal payments.

14.     Defendants also knew that in some cases their illegal kickback scheme would ensure that contracts went to those vendors willing to pay Novation the biggest kickback (and not necessarily those able to supply the best product at the lowest price).  In so doing, defendants caused the government health insurance programs to incur increased health care costs.

15.     Under the Federal FCA and Texas MFPA, Relator seeks to recover damages, civil remedies, and civil penalties arising from Defendants' actions in soliciting, receiving and paying kickbacks and thereby causing the Novation Customers to present false records, claims, and statements to the United States Government, the state governments (including the State of Texas) and their respective agents in connection with Novation Customers' claims for excessive reimbursement for supplies and services provided to beneficiaries of the Medicare, Medicaid, and TRICARE/CHAMPUS programs.

16.     Relator has information and believes that the fraudulent practices described herein were typical of defendant Novation at all times material to this action and that VHA and the Vendor Defendants aided and abetted Novation in these activities.  Relator has information and believes that Defendants have engaged in these fraudulent practices from at least 1993 to present.

## II.     PARTIES

17.     *Qui tam* plaintiff and relator, Cynthia I. Fitzgerald ("Relator"), is a resident of Plano, Texas and was employed by Novation from July 1998 to February 1999 as a Senior Product Manager for Medical/Surgical products in their Irving, Texas office.  Shortly after Ms. Fitzgerald began to complain to senior management at Novation about these fraudulent practices, Novation terminated her employment in retaliation for her questioning their propriety. Ms. Fitzgerald files this action for violations of 31 U.S.C. §§ 3729 *et seq*. on behalf of herself, the United States Government pursuant to 31 U.S.C. § 3730(b)(1), and the State of Texas

pursuant to Texas Human Resources Code § 36.101. Ms. Fitzgerald has personal knowledge of the false records, statements and/or claims that defendant Novation – aided and abetted by VHA, UHC, and HPPI – caused the Novation Customers to submit to the government health insurance programs.

18.     In late 1998, Relator spoke about Novation's fraudulent practices with representatives of the U.S. Department of Justice. Ms. Fitzgerald's first contact with the Government regarding Novation was a call to the main number at the United States Department of Justice in Dallas, Texas while she still was employed by Novation. She was referred to and spoke with individuals in the Justice Department's Antitrust Division in Dallas.

19.     Relator informed the Justice Department that she wanted to report facts related to health care fraud committed by Novation. In summary, she reported that she worked for Novation; that Novation served as a purchasing agent to buy supplies for hospitals all across the country; and that Novation was accepting bribes and kickbacks to award contracts to supply goods and services to hospitals. She also described details of her experiences and information concerning improper relationships between Novation and Becton Dickinson, Heritage Bag Company, and Johnson & Johnson.

20.     The Dallas Department of Justice representatives told Relator that the Dallas office did not handle the kind of complaint Ms. Fitzgerald was bringing. It directed Relator to the Criminal Antitrust Division of the Department of Justice in Philadelphia, Pennsylvania. Relator had two telephone conversations with the Philadelphia office of the Justice Department in or about January 1999, speaking with Wendy Bostwick Norman, an attorney in that office. After two substantive telephone conversations about the nature of the wrongdoing Ms. Fitzgerald was observing, Ms. Norman's office expressed no interest in taking action on her complaints.

21.     Relator then called the Dallas office back to inform them of that fact and to inquire further whether there was anything the Dallas office could do. Two of these calls to the Dallas office of DOJ's Antitrust Division are reflected in phone records Relator has been able to

obtain for the mobile phone that she was using during her tenure at Novation and in the months after her departure on February 5, 1999.

22.     These records show that on Friday, January 22, 1999, two weeks before she was terminated from her job at Novation, Ms. Fitzgerald placed two calls to (214) 880-9401, the phone number for the Antitrust Division of the Department of Justice in Dallas, Texas.  The combined length of the two calls was 16 minutes.

23.     In late 1998 and the first half of 1999, Relator spoke frequently with Dr. Roy Lewis, Jr., a close friend, about the improper business practices she observed at Novation, Ms. Fitzgerald's conversations with government officials about these practices, and the Government's then disinterest in investigating these practices.

24.     On Sunday, July 4, 1999, at the suggestion of Dr. Lewis, Relator went through the exercise of writing down the frustrations she was feeling about her experiences at Novation and the Government's unwillingness to investigate Novation for these practices.  The result of these efforts was a four-and-a-half page entry in the "Daily Record of Events" section of Relator's Franklin Covey organizer.  On the fourth page, Relator mentions having made calls to the Government and being frustrated with the Government's lack of interest in her allegations.

25.     Starting in the summer of 1999, Relator began meeting with William P. Bandy, the former President of a medical supply and equipment distributor.  In the course of their meetings, Relator shared her negative experiences with Novation.  In addition, she informed Mr. Bandy that she had contacted the Government about Novation's fraudulent practices but the Government was not interested.

26.     In October 1999, Relator met with attorney Theodore Anderson in Dallas, Texas. During this meeting, Ms. Fitzgerald informed Mr. Anderson that she had contacted the Government about Novation's fraudulent practices and was disillusioned with the Government's response to her information.

27.     Shepard Hoffman represented Relator in 2002 in connection with her June 20, 2002, deposition in an antitrust case Retractable Technologies Inc. had brought against its

competitors, Novation, and other GPOs.  Mr. Hoffman was aware of Relator's concerns with Novation's practices and her frustration about the Government's response to her complaints. After Relator's deposition, Mr. Hoffman was contacted by a female Department of Justice lawyer based out of Philadelphia who wanted to speak with Relator about her employment at Novation in conjunction with an active federal investigation.

28.     In or about October 2002, Relator contacted the law firm Phillips & Cohen about possible legal remedies for Novation's fraudulent conduct.

29.     On January 28, 2003, Relator was interviewed by Special Agent Damon Young regarding her experiences at Novation.  Agent Young was employed by the Office of Inspector General of the U.S. Department of Health and Human Services.

30.     On March 10, 2003, Relator met with and again was interviewed by HHS OIG Special Agents Damon Young and Jason E. Meadows in Dallas, Texas (1100 Commerce St., Room 629).

31.     On July 15, 2003, Relator filed her complaint for violations of the federal False Claims Act and the Texas Medicaid Fraud Prevention Act in the U.S. District Court for the Northern District of Texas.

32.     Defendant Novation, the nation's largest group purchasing organization, is a Delaware corporation with its principal place of business at 125 E. John Carpenter Freeway in Irving, Texas.  Novation was founded in January 1998 by combining VHA Supply Company and UHC Supply, the former purchasing arms of the 2,300-member VHA and UHC hospital networks.  Novation is a for-profit company jointly owned by VHA and UHC whose core business is negotiating and managing contracts for supplies and services on behalf of the 2,300 VHA and UHC Members as well as the over 5,000 HPPI customers who access those contracts. Novation manages $25 billion in group purchasing volume.  Under Novation's portfolio of over 600 contracts with hundreds of vendors, Novation Customers can purchase nearly all of their supply and service needs, including such diverse product lines as medical/surgical supplies, pharmaceuticals, diagnostic imaging products, laboratory products, business products, capital

equipment and dietary and food products.  As its controlling shareholder (with a 77% ownership interest), VHA has populated Novation largely with staff from its former purchasing company, VHA Supply Company.  Most, if not all, of the fraudulent practices in which Novation has engaged originated at VHA and VHA Supply Company.  Novation's stated mission is to use VHA's and UHC's considerable combined purchasing power "to deliver comprehensive value and the industry's best pricing to its customers."

33.    Defendant VHA, formerly known as Voluntary Hospitals of America Inc., is a Delaware corporation, with its principal place of business located at 220 E. Las Colinas Boulevard in Irving, Texas.  VHA is a nationwide network of community-owned health care systems and their physicians and includes such leading health care organizations as Baylor Health Care System in Dallas, Mayo Foundation in Rochester, Minnesota, and Cedars-Sinai Health System in Los Angeles.  VHA has more than 2,200 members in 48 states (excluding Nevada and Utah).  VHA is a for-profit cooperative that was formed in 1977 to pool the resources and purchasing power of several formerly disparate community-owned hospitals.  VHA's member organizations purchase a large percentage of their supplies and services under the more than 600 Novation contracts.  From 1985 until January 1998, VHA had its own group purchasing organization, VHA Supply Company ("VHA Supply"), which negotiated supply contracts on its members' behalf.  In January 1998, VHA joined its purchasing business with UHC's to form Novation, VHA and UHC's jointly-owned GPO.  VHA has a 77% ownership interest in Novation.  Many of the fraudulent practices described herein originated from VHA Supply, which employed these tactics throughout its existence.  Novation – which was created by combining UHC and VHA Supply and is largely staffed by former employees of VHA Supply – continued to perpetrate and expand the fraudulent practices of VHA Supply.  VHA bears liability for the fraud committed by its contracting arm, VHA Supply, before it merged VHA Supply with UHC's contracting functions to create Novation.

34.     Defendant Becton Dickinson & Co. ("Becton Dickinson") manufacturers and sells medical supplies, devices, and laboratory and diagnostic equipment.  Becton Dickinson is a New Jersey corporation with headquarters in Franklin Lakes, New Jersey.

35.     Defendant Heritage Bag Company ("Heritage Bag") manufactures plastic waste and storage bags, and specializes in the manufacturer of waste bags used by healthcare providers. Heritage Bag is a privately-held corporation with headquarters in Carrollton, Texas.

### III.     UNNAMED CO-CONSPIRATORS

36.     Many vendors have offered to pay and have paid Novation and VHA fees well in excess of 3% in order to secure contracts to supply VHA's and UHC's members and HPPI's customers.  As stated below, pharmaceutical manufacturers have paid Novation some of the highest fees of any vendors in exchange for contract awards.[3]  These fees often have ranged between 14% and 30%, and they had no connection to the administrative costs Novation incurred in managing the contracts.  Novation's customers purchased the manufacturers' drugs pursuant to Novation contracts tainted by these kickbacks, and they then submitted claims for government reimbursement for the costs of the drugs.  Both the offeror and the recipient of the kickbacks – the drug manufacturers and Novation – are liable under the federal False Claims Act and the TMFPA for causing the submission of these false claims.  The pharmaceutical manufacturers' payments violated the Anti-Kickback Act and are not covered by any safe harbor.  These vendors conspired with Novation to violate the Anti-Kickback Act and False Claims Act and participated in the illegal activities described herein.  By offering to pay and paying unlawful fees, these vendors committed an overt act in furtherance of the conspiracy.

37.     While these vendors are not named defendants in this Complaint, they nevertheless are co-conspirators with Defendants in their scheme to violate the Anti-Kickback Act, the Federal FCA, and the Texas MFPA.  These vendors include the pharmaceutical companies identified in paragraphs 128 below, *i.e.*, Johnson & Johnson, Nycomed, Inc., Ben-

---

[3] *See infra* at ¶ 128.

11

Venue Laboratories, Dupont Pharmaceutical Company, Abbott Laboratories, Bristol-Meyers Squibb Co., and Merck & Co., all of which are unnamed co-conspirators.

38.     In addition, distribution companies conspired with Novation and VHA to violate the Anti-Kickback Act and the False Claims Act.  Besides choosing the vendors to whom it will award contracts, Novation also controls the distribution channels for the products purchased under its contracts.  For each of its product lines, *e.g.*, medical/surgical supplies, dietary and food services, Novation awards an exclusive right to distribute the products purchased under its contracts to a few select distributors whom Novation calls "Authorized Distributors."

39.     Novation requires "Authorized Distributors" to pay it a monthly fee based on the total purchases of products made by its customers.  Although Novation provides distributors with a minimum percentage for what this fee must be, Novation leaves it to the distributor's discretion to propose the amount of the percentage.  Under such liberal contracting guidelines, Novation regularly solicited and accepted fees in excess of its reasonable administrative costs from distributors in exchange for awarding them an authorized-distributor contract.

40.     In addition to the monthly fee, Novation also encourages bidders to propose fee enhancements – ways for distributors "to enhance the fee paid to Novation" – and additional fees.  These enhancements and additional fees have no relationship to the underlying contract and are just another way for Novation to increase its revenue.

41.     In short, as a condition of receiving distribution contracts, these distributors offered to pay and paid Novation fees that often exceeded 3%, and these fees were added to the price of the products or services paid by the GPOs' Members.  These fees had no connection to the administrative costs Novation incurred in managing the contracts.  The Members, in turn, obtained government reimbursement for the distribution costs (including these unlawful fees) of the supplies and services they received from Novation's "Authorized Distributors."  Because the distribution contracts were tainted by unlawful fees, these claims for government payment were not reimbursable.  Both the offeror and the recipient of the kickbacks – the distribution companies and Novation – are liable under the federal False Claims Act and the TMFPA for

causing the submission of these false claims. By offering to pay and paying Novation and VHA fees well in excess of the GPOs' administrative costs, any such distribution companies committed an overt act in furtherance of the conspiracy.

42.     While distribution companies are not named defendants in this Complaint, they nevertheless are co-conspirators with Defendants in their scheme to violate the Anti-Kickback Act and the False Claims Act.

43.     Various other persons, firms, corporations, or joint ventures not named as defendants herein, the identities of which are presently unknown, may have participated as co-conspirators in the Defendants' illegal activities by performing acts and making statements in furtherance of the Anti-Kickback Act and False Claims Act violations and conspiracy described herein.

## IV.     JURISDICTION AND VENUE

44.     This Court has jurisdiction over the subject matter of the Federal FCA action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a), which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730. This Court has jurisdiction over the subject matter of the Texas Medicaid Fraud Prevention Act ("Texas MFPA") action pursuant to 28 U.S.C. § 1367 and 31 U.S.C. § 3732(b) because the Texas MFPA action arises from the same transactions or occurrences as the Federal FCA action.

45.     This Court has personal jurisdiction over the defendants pursuant to 31 U.S.C. § 3732(a), which provides for nationwide service of process. During the relevant period, defendants resided and/or transacted business in the Northern District of Texas.

46.     Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because defendants each can be found in, resides in, and/or transacts business in the Northern District of Texas and because many of the violations of 31 U.S.C. § 3729 described herein occurred within this judicial district.

## V. FEDERAL AND STATE HEALTHCARE PROGRAMS

### A. The Medicare Program

47.     In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare Program, to pay for the costs of certain healthcare services. Entitlement to Medicare is based on age, disability, or affliction with end-stage renal disease. *See* 42 U.S.C. §§ 426, 426A. Part A of the Medicare Program authorizes payment for institutional care, including hospital, skilled nursing facility and home health care. *See* 42 U.S.C. §§ 1395c-1395i-4. Most hospitals, including VHA's and UHC's Members, derive a substantial portion of their revenue from the Medicare Program.

48.     The United States Department of Health and Human Services ("HHS") is responsible for the administration and supervision of the Medicare Program. The Center for Medicare Services ("CMS") is an agency of HHS and is directly responsible for the administration of the Medicare Program.

49.     Under the Medicare Program, CMS makes payments retrospectively (after the services are rendered) to hospitals for inpatient services. Medicare enters into provider agreements with hospitals in order to establish the hospitals' eligibility to participate in the Medicare Program. However, Medicare does not prospectively contract with hospitals to provide particular services for particular patients. Any benefits derived from those services are derived solely by the patients and not by Medicare or the United States.

50.     As detailed below, Novation's customers submitted claims both for specific services provided to individual beneficiaries and claims for general and administrative costs incurred in treating Medicare beneficiaries.

51.     To assist in the administration of Medicare Part A, CMS contracts with "fiscal intermediaries." 42 U.S.C. § 1395h. Fiscal intermediaries, typically insurance companies, are responsible for processing and paying claims and auditing cost reports.

52.     Upon discharge of Medicare beneficiaries from a hospital, the hospital submits claims for interim reimbursement for items and services delivered to those beneficiaries during

their hospital stays. 42 C.F.R. §§ 413.1, 413.60, 413.64. Hospitals submit patient-specific claims for interim payments on a Form UB-92 (and prior to 1992, on a Form UB-82).

53.     As a prerequisite to payment by Medicare, CMS requires hospitals to submit annually a form 2552, more commonly known as the Hospital Cost Report. Cost Reports are the final claim that a provider submits to the fiscal intermediary for items and services rendered to Medicare beneficiaries.

54.     After the end of each hospital's fiscal year, the hospital files its Hospital Cost Report with the fiscal intermediary, stating the amount of reimbursement the provider believes it is due for the year. *See* 42 U.S.C. § 1395g(a); 42 C.F.R. § 413.20. *See also* 42 C.F.R. § 405.1801(b)(1). Hence, Medicare relies upon the Hospital Cost Report to determine whether the provider is entitled to more reimbursement than already received through interim payments, or whether the provider has been overpaid and must reimburse Medicare. 42 C.F.R. §§ 405.1803, 413.60 and 413.64(f)(1).

55.     Novation's and Hhospital customers were, at all times relevant to this complaint, required to submit Hospital Cost Reports to their fiscal intermediaries.

56.     Medicare payments for inpatient hospital services are determined by the claims submitted by the provider for particular patient discharges (specifically listed on UB-92s/UB-82s) during the course of the fiscal year. On the Hospital Cost Report, this Medicare liability for inpatient services is then totaled with any other Medicare liabilities to the provider. This total determines Medicare's true liability for services rendered to Medicare beneficiaries during the course of a fiscal year. From this sum, the payments made to the provider during the year are subtracted to determine the amount due the Medicare Program or the amount due the provider.

57.     Under the rules applicable at all times relevant to this complaint, Medicare, through its fiscal intermediaries, had the right to audit the Hospital Cost Reports and financial representations made by VHA's and UHC's Member hospitals, and HPPI's hospital customers, to ensure their accuracy and preserve the integrity of the Medicare Trust Funds. This right

includes the right to make retroactive adjustments to Hospital Cost Reports previously submitted by a provider if any overpayments have been made.  42 C.F.R. § 413.64(f).

58.　　Every Hospital Cost Report contains a "Certification" that must be signed by the chief administrator of the provider or a responsible designee of the administrator.

59.　　For cost reporting periods prior to September 30, 1994, the responsible provider official was required to certify, in pertinent part:

> [T]o the best of my knowledge and belief, it [the Hospital Cost Report] is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted.

Form 2552-81.

60.　　Thus, the provider was required to certify that the filed Hospital Cost Report is (1) truthful, *i.e.*, that the cost information contained in the report is true and accurate, (2) correct, *i.e.*, that the provider is entitled to reimbursement for the reported costs in accordance with applicable instructions, and (3) complete, *i.e.*, that the Hospital Cost Report is based upon all information known to the provider.

61.　　The "applicable instructions" contained in the pre-September 1994 certification included the requirement that services described in the cost report complied with Medicare program requirements, including the provision outlawing kickbacks, codified in 42 U.S.C. § 1320a-7b(b).

62.　　The pre-September 1994 Hospital Cost Report (Form 2552-81) reminded providers that "intentional misrepresentation or falsification of any information contained in this cost report may be punishable by fine and/or imprisonment under federal law."

63.　　On September 30, 1994, Medicare revised the certification provision of the Hospital Cost Report to add the following:

> I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

Form 2552-92.

64.     Subsequently, in or about 1996, the Hospital Cost Report was revised again to include the following notice:

> Misrepresentation or falsification of any information contained in this cost report may be punishable by criminal, civil and administrative action, fine and/or imprisonment under federal law. Furthermore, if services identified in this report were provided or procured through the payment directly or indirectly of a kickback or where otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result.

65.     Under all versions of the Form 2552 certification, the provider certified that the services provided in the cost report were not infected by a kickback.

66.     Novation, VHA's Members, UHC's Member hospitals, and HPPI's hospital customers are familiar with the laws and regulations governing the Medicare Program, including requirements relating to the completion of cost reports.

67.     A hospital is required to disclose all known errors and omissions in its claims for Medicare reimbursement (including its cost reports) to its fiscal intermediary.  42 U.S.C. § 1320a-7b(a)(3) specifically creates a duty to disclose known errors in cost reports:

> Whoever . . . having knowledge of the occurrence of any event affecting (A) his initial or continued right to any such benefit or payment . . . conceals or fails to disclose such event with an intent fraudulently to secure such benefit or payment either in a greater amount or quantity than is due or when no such benefit or payment is authorized . . . shall in the case of such a . . . concealment or failure . . . be guilty of a felony.

68.     Hospital Cost Reports submitted by Member hospitals were, at all times material to this complaint, signed by Member hospital employees, usually a hospital official and, in some cases, a Corporate Reimbursement Department employee, who attested, among other things, to the certification quoted above.

**B.      The Medicaid Program**

69.     Medicaid is a joint federal-state program that provides health care benefits for certain groups, primarily the poor and disabled.  The federal involvement in Medicaid is largely limited to providing matching funds and ensuring that states comply with minimum standards in the administration of the program.

70.     The federal Medicaid statute sets forth the minimum requirements for state Medicaid programs to qualify for federal funding, which is called federal financial participation (FFP).  42 U.S.C. §§ 1396, *et seq*.

71.     Each state's Medicaid program must cover hospital services.  42 U.S.C. § 1396a(10)(A), 42 U.S.C. § 1396d(a)(1)-(2).

72.     In many states, provider hospitals participating in the Medicaid program file annual cost reports with the state's Medicaid agency, or its intermediary, in a protocol similar to that governing the submission of Medicare cost reports.  In Texas, hospitals are reimbursed by Medicaid on the basis of their Medicare cost reports.

73.     In some states, such as Texas, provider hospitals participating in the Medicaid program file a copy of their Medicare cost report with the Medicaid program, which is then used by Medicaid or its intermediaries to calculate Medicaid reimbursement.  In other states, provider hospitals file a separate Medicaid cost report.

74.     Individual Medicaid programs use the Medicaid patient data in the cost report to determine the reimbursement to which the facility is entitled.  The facility receives a proportion of its costs equal to the proportion of Medicaid patients in the facility.

75.     Where a provider submits the Medicare cost report with false or incorrect data or information to Medicaid, this necessarily causes the submission of false or incorrect data or information to the state Medicaid program, and the false certification on the Medicare cost report necessarily causes a false certification to Medicaid as well.

76.     Most VHA and UHC Members located in Texas sought reimbursement from the Texas Medicaid program for the time period pertinent to this Complaint.

C.      **The TRICARE/CHAMPUS Program**

77.     At all times relevant to this Complaint, many VHA and UHC Member hospitals, and many HPPI hospital customers, were enrolled in, and sought reimbursement from, the Civilian Health and Medical Program of the Uniformed Services (CHAMPUS), now known as TRICARE Management Activity/CHAMPUS ("TRICARE/CHAMPUS").

78.     TRICARE/CHAMPUS is a federally-funded program that provides medical benefits, including hospital services, to (a) the spouses and unmarried children of (1) active duty and retired service members, and (2) reservists who were ordered to active duty for thirty days or longer; (b) the unmarried spouses and children of deceased service members; and (c) retirees. Hospital services at non-military facilities are sometimes provided for active duty members of the armed forces, as well.  10 U.S.C. §§ 1971-1104; 32 C.F.R. § 199.4(a).

79.     In addition to individual patient costs, TRICARE/CHAMPUS reimburses hospitals for two types of costs based on the Medicare cost report:  capital costs and direct medical education costs.  32 C.F.R. § 199.6.

80.     A facility seeking reimbursement from TRICARE/CHAMPUS for these costs is required to submit a TRICARE/CHAMPUS form, "Request for Reimbursement of CHAMPUS Capital and Direct Medical Education Costs" ("Request for Reimbursement") in which the provider sets forth its number of TRICARE/CHAMPUS patient days and financial information which relates to these two cost areas and which is derived from the Medicare cost report for that facility.

81.     This Request for Reimbursement requires that the provider expressly certify that the information contained therein is "accurate and based upon the hospital's Medicare cost report."

82.     Upon receipt of a hospital's Request for Reimbursement and its financial data, TRICARE/CHAMPUS or its fiscal intermediary applies a formula for reimbursement wherein the hospital receives a percentage of its capital and medical education costs equal to the percentage of TRICARE/CHAMPUS patients in the facility.

83.     VHA and UHC Member hospitals and HPPI hospital customers submitted Requests for Reimbursement for their hospitals to TRICARE/CHAMPUS that were based on their Medicare cost reports.  Whenever these hospitals' Medicare cost reports contained falsely inflated or incorrect data or information from which the hospitals derived their Requests for

Reimbursement submitted to TRICARE/CHAMPUS, those Requests for Reimbursement were also false.

84.     Whenever these hospitals' Requests for Reimbursement were false due to falsity in their Medicare cost reports, these hospitals falsely certified that the information contained in their Requests for Reimbursement was "accurate and based upon the hospital's Medicare cost report." By soliciting and accepting kickbacks that resulted in these hospitals' cost reports being false, Novation caused these false certifications.

85.     Novation knew or recklessly disregarded that false claims contained in the Medicare cost reports of VHA and UHC Members and HPPI's hospital customers often would affect TRICARE/CHAMPUS reimbursement as well.

## VI.     BACKGROUND ON GROUP PURCHASING ORGANIZATIONS

86.     In the mid-to-late 1980s, mergers among several of the large hospital suppliers increased their market power and helped drive up the costs of medical supplies and services. In response, individual hospitals and health systems sought to increase their bargaining power by joining to form hospital buying cooperatives, known as group purchasing organizations ("GPOs"). By pooling the purchases of their member hospitals and negotiating group contracts for supplies and services, GPOs could use volume purchasing as leverage to negotiate lower prices with suppliers. Member hospitals would also be able to reduce their purchasing staffs, thereby lowering operating costs, as the GPO assumed their contracting functions.

87.     As the primary purchasing agent for its member hospitals, the GPO handles all aspects of group contracting – from drafting the request for proposal, soliciting and evaluating bids, to awarding and subsequently managing the group contracts. Once it has awarded a group contract to a vendor, the GPO notifies hospital members of its terms (Novation issues members a "Launch Packet") and hospital members buy directly from the vendor for the price specified in the group contract. The GPO does not purchase any of the contracted supplies or services for its members nor does it take custody of the supplies.

88.     Although they have an ownership interest in the GPOs and are the beneficiaries of the contracting services GPOs provide, neither the member hospitals nor their hospital network pays the GPOs' operating costs.  Instead, GPOs are primarily financed by the vendors with whom the GPOs contract through the use of "administrative fees."  Administrative fees are typically calculated as a percentage of each hospital member's purchases from a vendor.

89.     To enable GPOs to calculate their administrative fee, vendors provide GPOs with monthly reports listing, for each of its members, the amount of supplies and services the member purchased from the vendor the previous month under a particular group contract or set of contracts.

90.     After paying its operating expenses, GPOs typically distribute any revenue they earn to their hospital members or hospital networks in the form of annual dividends.  Where the administrative fees the GPO receives from vendors exceed its operating costs, a GPO should return the surplus fees to the member hospitals/networks in proportion to the amount of purchases each member made under the group contracts.

## VII.     THE ANTI-KICKBACK ACT AND "SAFE HARBOR"

91.     Federal law makes it a felony to "solicit[] or receive[] any remuneration (including any kickbacks, bribe or rebate) directly or indirectly, overtly or covertly, … in return for purchasing, . . . ordering, or ***arranging for or recommending*** purchasing, . . .  or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program [Medicare, Medicaid or TRICARE/CHAMPUS]."  42 U.S.C. § 1320a-7b(b) (emphasis added).  It is likewise a felony to "offer[] or pay[] any remuneration (including any kickback, bribe or rebate), directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person . . .  to purchase, lease, order or arrange for or recommend purchasing, leasing or ordering any good, facility, service or item for which payment may be made in whole or in part under a Federal health care program."  *Id.*

92.     In 1986, the GPO-industry convinced Congress to amend the Act to include a safe harbor for certain administrative fees paid to a GPO by a vendor.  *See* 42 U.S.C. § 1320a-

7b(b)(3)(C).  The safe harbor provision exempts reasonable vendor payments to cover GPOs' administrative costs that are properly and fully disclosed by the GPO.

93.    The original bill contained an express limit of 3% on the percentage of contract sales that vendors could pay GPOs to cover administrative costs.  H. Conf. Rep. 1012, 99th Cong., 2d Sess. 311 (1986).  The House and Senate Conferees struck this percentage limit because of a concern that it would encourage GPOs to increase their administrative fees, which were generally below 3%, *to the 3% limit*.  *Id*.  The Conference Report stated that, while the safe harbor would allow GPOs to be paid fees, it still would ensure that "only reasonable and above-board vendor-paid GPO fee arrangements receive the protection of [the] exclusion."  *Id*.  Congress ordered the Secretary of Health and Human Services to monitor vendor payments for possible abuse, "particularly those in excess of 3 percent."  *Id*.

94.    Congress imposed two disclosure conditions on GPOs that received administrative fees from vendors if those fees are to qualify for the safe harbor.  To qualify for the safe harbor:  (i) the GPO must have a written contract with each hospital that specifies the amount or percentage to be paid by the vendor to the GPO; and (ii) the GPO must disclose to each provider the specific amount paid by each vendor for purchases made by that provider.  42 U.S.C. § 1320a-7b(b)(3)(C).

95.    Regulations issued by the HHS Inspector General implemented Congress's directive to monitor for possible abuses.  In defining what constitutes an appropriate administrative fee, the regulations require that the following criteria be satisfied:  (1) the GPO must have a written agreement with each of its members under which the fees (and its terms) are disclosed; (2) the agreement must state that the fees are to be 3 percent or less of the purchase price of the supplies to be provided, or for fees above 3 percent, the amount or maximum amount to be paid by each vendor; and (3) the GPO must provide each member with an annual report listing the amount the GPO received from each vendor in administrative fees based on that member's purchases.  42 C.F.R. § 1001.952(j).

96.     In the regulatory history, the Inspector General emphasized Congress's intent to limit the safe harbor to "reasonable" administrative fees received by GPOs, and its concern that fees over 3% may be abusive.  In rejecting industry requests that GPOs be permitted to disclose merely the range of fees vendors pay them rather than the specific amount, the Inspector General stated:

> We agree that it is not necessary, in all circumstances, to specify the exact fees the GPO will receive from its vendors as a result of a particular member's purchases. ***The legislative history to this exception, however, shows Congress's concern for excessive GPO fees, particularly those exceeding 3 percent.***  (See, H.Conf. Rep. 1012, 99th Cong., 2d Sess. 310-11 (1986)).  For this reason, we are revising this provision (see paragraph (j)(1)(i)) so that a GPO needs to specify the administrative fee it is paid from vendors only if any fee will be above 3 percent.

56 Fed. Reg. 35,952, 35,982 (emphasis added).

## VIII.   DEFENDANTS' FRAUDULENT SCHEMES

97.     As the nation's largest GPO, Novation negotiates contracts on behalf of – and thereby arranges for and recommends the purchasing of supplies and services for – more than 7,300 health care providers (2,300 VHA and UHC Members and more than 5,000 HPPI customers) that constitute 22% of the national market of staffed beds, 29% of total admissions, and 30% of total surgeries.  As Novation informs potential bidders in its Invitations-to-Bid, Novation's customers represent greater than $25 billion in actual annual purchasing volume and $32 billion in purchasing potential.  As these figures demonstrate, a contract with Novation can mean millions of dollars in sales and increased market share for the successful vendor who is awarded the group contract.

98.     Rather than use their considerable collective purchasing power to serve their customers (the Novation Customers) by awarding group contracts to vendors offering the best product at the lowest price, Novation and VHA Supply – with the assistance of VHA – often acted to increase their profits, and those of their officers and executives, by awarding contracts to the Vendor Defendants and other vendors who paid them the largest kickback.

99.     At all times relevant to this Complaint, meaning from at least 1993 to present, Novation and VHA have solicited and received, from the Vendor Defendants and other vendors, kickbacks and other illegal remuneration as payment for awarding them group contracts.  Unlike the administrative fees vendors pay to GPOs, which are condoned by Congress, these kickbacks and other illegal remuneration are in no way tied to the administrative costs Novation or VHA Supply incurred in managing the contracts.  Nor, oftentimes, are they calculated based on clearly defined, objective criteria such as the volume of purchases made under the contract by Novation's or VHA Supply's customers.  Instead, they are simply payments Novation and VHA required vendors to pay up-front or throughout the life of the contract for the privilege of being awarded a group contract and thereby gaining access to the GPOs' 7,300 customers.

100.     Since these payments bear no relationship to the performance of the underlying contracts (or the administrative costs incurred in managing those contracts), Novation and VHA regularly chose among the competing vendors based on who was willing to pay the most.  Under this guiding business "principle," Novation has awarded contracts to the vendors who have been able to pay the biggest kickbacks, and VHA Supply did so previously.  The Vendor Defendants and other vendors, in turn, inflated the prices they charged under the contract in order to recoup the costs of paying Novation and VHA Supply the kickbacks and other illegal remuneration necessary to win the contract and gain access to the gigantic market that VHA and then Novation represented.  These increased costs are ultimately borne by the insurers, both government and private, who reimburse the Novation Customers for the costs of treating their insureds/beneficiaries.  Small vendors, possessing fewer financial resources but safer, at times cheaper, and more innovative products, have often been unwilling or unable to make such up-front payments and consequently were routinely shut out of Novation and VHA contracts.

101.     At all times relevant to this Complaint, Novation and VHA concealed the existence of these kickbacks and other remuneration from Novation Customers.  The majority of the monies/remuneration received from these kickbacks were retained by Novation and VHA.  Novation and VHA distributed a modicum of their ill-gotten gains to the VHA and UHC

Members in annual dividends of their revenue as a way of lulling the Members into believing they performed properly on the Members' behalf and persuading the Members' to continue to utilize their services.

102.     Defendants knew, or at a minimum recklessly disregarded the possibility, that the Novation Customers were certifying compliance with the laws and regulations regarding the provision of health care services, including the Anti-Kickback Act, in order to receive payments under Medicare and Medicaid.

103.     Defendants knowingly or recklessly caused these certifications to be false because many of the services provided pursuant to cost reports and other government claims for reimbursement were not provided in compliance with the laws and regulations regarding the provision of health care services.  Most notably, supplies or services charged to Medicare and Medicaid were procured via remuneration in exchange for the referral or recommendation of purchases, in violation of the Anti-Kickback Act.

104.     As a Senior Product Manager at Novation from July 1998 to February 1999, Relator was responsible for negotiating and managing a portfolio of group contracts for medical/surgical supplies and services that was worth $243 million.  During her six months in this position, Relator was privy to the inner workings of Novation's contracting process, including the criteria Novation utilized to determine the vendors to whom it would award contracts.  From her interactions with her superiors Sherry Woodcock and John Burks, among others, Relator quickly came to understand that her performance would be judged not merely by her ability to deliver contracts for the best supplies at the lowest prices, but also by the amount of revenue she was able to generate for Novation in the form of up-front payments and other illegal remuneration, of which the Members often were not apprised.  Relator learned that, under Novation's employee compensation packages (and VHA's before that), the employees responsible for negotiating contacts were compensated based on increases in revenue to the GPOs from year-to-year.  They were not compensated based on the savings they achieved for Novation Customers on the price of the supplies and services for which they negotiated.  After raising concerns about these practices

with Novation's Human Resources staff, Senior Management, and In-House Legal Counsel and having those concerns summarily dismissed, Relator realized that these fraudulent practices were not unique to the Medical/Surgical Division but instead pervaded Novation's business. As described below, these illegal payments/remuneration took a wide variety of forms.

## A.   Up-Front Payments to "Buy the Contracts"

### 1.   Johnson & Johnson's offer to buy the IV Catheter Contract

105.    One of the first medical/surgical contracts to which Relator was assigned in her position as Senior Contract Manager at Novation was Contract No. MS8020B, a three-year contract for "IV Standard and Safety Catheters and NOVAPLUS® IV Start Kits." Under this contract, Novation was seeking a vendor to supply IV Catheters as well as IV Start Kits under Novation's private label brand, NOVAPLUS®, to the Novation Customers. This was the first contract for IV Catheters and Start Kits put out for public competitive bid since Novation was formed. Johnson & Johnson knowingly offered Relator illegal remuneration to obtain this contract.

106.    Shortly after Relator received and opened the bids on the IV Catheter Contract, sales representatives from Johnson & Johnson called Relator to request a meeting with her to discuss Johnson & Johnson's bid. Relator agreed. During the meeting, it quickly became clear that the Johnson & Johnson sales representatives had no substantive questions regarding the contract but rather had convened the meeting simply to inquire about Johnson & Johnson's prospects of receiving the bid award. Unwilling to provide this information, Relator called an abrupt end to the meeting.

107.    Having had their lobbying efforts rebuffed by Relator, the Johnson & Johnson sales staff contacted Relator's supervisor, Sherry Woodcock, and arranged a private meeting with Woodcock to which Relator was not invited. When Relator later learned of the meeting, she became concerned as to why she was being excluded and decided that, as the Senior Product Manager responsible for awarding this contract, she would attend. The meeting occurred prior to the contract award in November 1998. Early on in the meeting, while discussing Contract

No. MS8020B, "IV Standard and Safety Catheters and NOVAPLUS® IV Start Kits," one of the Johnson & Johnson sales representatives in its corporate accounts department (an employee named Steve Fannin) asked Relator, in Woodcock's presence, "How much will it take to get the contract?"  When Relator appeared startled and did not have a ready response, the sales representative added, "[o]thers before you have done it."

108.    Offended by the request that she agree to accept a kickback (the price tag of which she was expected to name) in exchange for awarding the contract to Johnson & Johnson, Relator turned to her supervisor, Sherry Woodcock, and said "Oh, no.  This is illegal, and I don't look good in orange and I don't look good in stripes."  Shortly thereafter, when the meeting had concluded, Relator repeated her concerns to Sherry Woodcock about what had just transpired (*i.e.*, Johnson & Johnson's offer to pay Novation a kickback to obtain the IV Catheter business) and asked Woodcock whether she would like Relator to notify John Burks, the former Head of Novation's Medical/Surgical Division, or whether Woodcock would rather do it.  Woodcock assured Relator that she would inform Burks.

109.    Over the ensuing seven to ten days, when Relator would ask Woodcock if she had spoken with Burks yet, Woodcock's standard reply was that she had been unable to get to it.  Frustrated by Woodcock's apparent unwillingness to address the issue, Relator spoke with Burks herself.  According to Burks, while Johnson & Johnson's actions may have been unethical, he did not consider them to be illegal.  Burks believed that Relator's suggested action – disqualifying Johnson & Johnson's bid – was too harsh a punishment.  After Burks refused to take action against Johnson & Johnson, Relator next took the matter to Novation's Human Resources staff, William Laws, Jr. and Shirley Lopez, and in-house counsel, Gerry Rubin, but was similarly rebuffed.  Based on the allegations in the foregoing paragraphs, Johnson & Johnson offered Novation remuneration in order to obtain contracts to supply IV catheters and IV start kits.

110.    At the same time that she was being stonewalled by her superiors on this front, Relator also was beginning to have concerns about the way in which other Novation contracts,

including the Can-Liner Contract (discussed below), had been awarded. Shortly after voicing these concerns, Relator began to receive criticism about her job performance, was ostracized by her co-workers, and quickly terminated.

111. With the newfound perspective on Novation's contracting process gained from her work on the IV Catheter and Can-Liner Contracts, Relator came to realize what was evident from Johnson & Johnson's question/comment ("How much will it take to get the contract? Others before you have done it."), *i.e.*, that it had been, and continued to be, the practice of Novation and VHA to award contracts to large vendors like Johnson & Johnson because of the amount they were willing to pay in up-front payments and other illegal remuneration. Under this standard operating procedure, Novation and VHA would suggest to vendors the amount of money they needed to receive up-front to award them the contract; the vendors, who were typically larger companies like Johnson & Johnson capable of paying such sums, paid Novation and VHA these monies to obtain the contract; and Novation and VHA ultimately awarded the contracts to these vendors.

112. Relator's refusal to play by these rules in the course of her work negotiating the IV Catheter Contract (and later the Can-Liner Contract) represented an unexpected (albeit short-lived) departure from the norm. Although Relator did not award the IV Catheter Contract to Johnson & Johnson in exchange for a kickback as had been the prior practice of Novation/VHA Supply (as discussed below, Relator awarded the Contract to Becton Dickinson), this was the first and last contract Relator ever negotiated for Novation. Novation fired her before she could interfere with any further contracts.

113. At no time did Novation or VHA inform the Novation Customers that it was their standard practice to solicit and receive kickbacks from vendors in exchange for awarding contracts.

**2. Becton Dickinson's $100,000 "Donation" to Novation in connection with winning the IV Catheter Contract**

114. In addition to Johnson & Johnson, the other primary vendor to submit a bid on the IV Catheter Contract was defendant Becton Dickinson and Company ("Becton Dickinson"). The

28

"Supply Partner Contacts" for Becton Dickinson in connection with catheters and IV Start Kits were National Account Manager Kevin Mooneyham and Vice President of Sales Michael Johnson. While evaluating the Johnson & Johnson and Becton Dickinson bids under the traditional criteria of price and product quality to determine which vendor to recommend to Novation management, Relator was pressured by her managers to consider what revenue each bidder would be able to provide Novation.

115.    In response to this pressure, Relator implemented a revenue-generating plan that had recently been initiated by other Senior Product Managers at Novation. Under this plan, Relator solicited from bidders bronze, silver, and gold-level "sponsorships" of Novation's latest Information-Technology project, "VHAseCURE.net," an intranet developed by VHA to enable VHA members to communicate with one another over the Internet. Although to the objective observer these sponsorship payments appear wholly unconnected to the underlying contract, both Novation and the bidders understood that such "sponsorships" would buy favorable consideration from Novation in making its bid award. Such "sponsorship" payments were over and above the administrative fee (expressed as a %-of-total sales made under the contract) that vendors like Becton Dickinson had agreed to pay Novation to cover its costs for administering the contract.

116.    In response to Relator's request for VHAseCURE.net donations, Becton Dickinson agreed to pay Novation $100,000. Becton Dickinson's willingness to make such a payment was one of the factors Relator considered in deciding to recommend Becton Dickinson as the proposed recipient of the IV Catheter and Start Kit contract. Shortly after approving Relator's recommendation Novation awarded Becton Dickinson the contract, and on or about December 2, 1998 Becton Dickinson sent Novation a check for $100,000. On January 5, 1999, Rick Ratliff, part of senior management at Novation, commended Relator for her work in procuring this and another "sponsorship" payment from vendors. In addition, a hand notation dated November 6, 1998 on the Executive Summary signed by Jim Hersma, the President of Novation, commended Relator for obtaining this payment.

117.     As its characterization of the payment on the face of the check – "Marketing Fee/Sole Award" – reveals, Becton Dickinson made this payment to Novation in order to receive the bid award. Even the Novation administrative staff understood that the $100,000 check was sent to secure the award. A handwritten note on the check written by an administrative assistant in Relator's department (named Lisa) states, "Cynthia, the check came in today to Sherry so I took up to Julie Cottonwood in [accounting]. **I presume that this is for the IV catheters** …." At no time did Novation ever disclose the existence, amount or purpose of these "sponsorship" payments to Novation Customers.

118.     Becton Dickinson's payment of $100,000 (combined with the 9% marketing fees it offered, *see infra* ¶¶ 134-135) in exchange for the award of the IV Catheter and Start Kit contract by Novation constituted a kickback. This kickback did not fall within the safe harbor. It bore no connection to the administrative costs Novation incurred in managing the contract. In addition, it exceeded the 3% reasonable cap on administrative fees, Novation did not fully disclose to its hospital customers in a written contract the kickback it received, and Novation did not fully disclose to its hospital customers the specific amount it received from Becton Dickinson with respect to each customer's purchases under the contract. This exchange of kickbacks between Becton Dickinson and Novation caused all claims for government reimbursement submitted by Novation's customers for purchasers under the IV Catheter and Start Kit contract to be false.

**3.      Becton Dickinson's payment in connection with winning the Needle Contract**

119.     In the course of negotiating Contract No. MS8020B, "IV Standard and Safety Catheters and NOVAPLUS® IV Start Kits," Relator had frequent dealings with Kevin Mooneyham, a sales manager at Becton Dickinson, and had earned his trust and respect. In late 1998, shortly after Relator awarded the IV Catheter Contract to Becton Dickinson, Mooneyham called Relator at work and asked her to meet him for lunch to discuss concerns he was having about activities taking place between Becton Dickinson and Novation regarding another upcoming contract. Over lunch, Mooneyham complained to Relator that Becton Dickinson had

agreed to pay Novation large sums of money in order to secure "a huge Novation contract" that was coming up for bid. In short, Mooneyham claimed, Becton Dickinson was "buying the business," *i.e.*, paying Novation an up-front fee to guarantee that it will be awarded the contract.

120. From Relator's knowledge and experience in Novation's Medical/Surgical Division, Relator knew that the contract to which Mooneyham was referring was Novation's upcoming three-year contract for hypodermic needles and syringes, a big ticket item for most hospitals and therefore a highly valuable contract. Novation awarded this contract to Becton Dickinson. Relator has information and believes that Novation never disclosed to Novation Customers, as required by the safe harbor rules and regulation, the fact that it had received this payment from Becton Dickinson in connection with awarding Becton Dickinson the needle contract.

121. Becton Dickinson's payment referred to above in exchange for the award of the needle and syringe contract by Novation constituted a kickback. For the reasons stated in paragraph 118 above, this kickback did not fall within the safe harbor. This exchange of kickbacks between Becton Dickinson and Novation caused all claims for government reimbursement submitted by Novation's customers for purchasers under the needle and syringe contract to be false.

**4. Vendor guarantees of revenue regardless of sales of their products**

122. Novation and VHA solicited and accepted guarantees of revenue from vendors regardless of sales in exchange for awarding them contracts.

123. In the mid-1990s, Brad Mohler, an employee of VHA, negotiated a VHA contract with American Health Products to supply gloves to VHA's members. The contract provided for the gloves to be sold under VHA's own label. Mohler's management, however, had directed him to award VHA's glove business to Allegiance, because it was a large company that would pay a large marketing fee. Mohler recognized that American Health Products' sales would not generate equally large revenues, regardless of the administrative fee it agreed to, because of the company's much smaller market share.

124.     To ensure that Mohler still met the revenue goals that were part of his compensation plan with VHA, Mohler and an employee of American Health Products, Ed Martika, agree to a guaranteed revenue arrangement.  American Health Products agreed to pay VHA a specific amount of revenue regardless of the volume of sales of American Health Products' gloves to VHA Members.  As a result of the Agreement, Mohler recommended that VHA award the contract to American Health Products, which VHA did.

125.     Relator has information and believes that VHA failed to inform its Members in writing, as required by the safe harbor rules and regulation, of the guaranteed revenue that American Health Products had agreed to pay regardless of volume of sales, or the specific amount it received from American Health Products with respect to each Member's purchases under the contract.  This belief is based on statements made to Relator by Mohler that VHA did not inform all Members of payments made by vendors in exchange for contract awards, Novation's failure to inform its hospital customers of such remuneration paid by vendors (as alleged herein), and Novation's adoption of its unlawful contracting practices from its predecessor VHA Supply.

**B.     "Administrative/Marketing Fees"**

126.     In its Invitations-to-Bid, Novation required all prospective bidders to include information on "marketing fees" to be paid to Novation and to calculate these fees as a percentage of sales made under the contract.  Novation does not prescribe any limits on the size of the marketing fee that it is willing to accept (or that bidders may offer).  Contrary to the safe harbor requirements regarding appropriate GPO fees, Novation routinely has solicited and accepted marketing fees that bear no relationship to its administrative costs in managing the contracts and failed to inform Novation Customers of the amount of the marketing fee they have agreed to receive.

127.     According to a Novation "Contract Administration Fee Report," as of November 18, 1999, Novation had accepted administrative/marketing fees above 3% on at least 186 or 31% of its 600 contracts.  For many of these contracts, Novation received

administrative/marketing fees as high as 30% of total sales made by Novation's customers under the contract. For instance, Novation received 30% administrative/marketing fees on Contract No. RX 132 (NOVAPLUS® Omnipaque, Nonionic Contrast Media, Hypaque) with Nycomed, Inc. and Contract No. RX84160 (NOVAPLUS® Diltiazem) with Ben Venue Laboratories. *See also infra* ¶ 126.

1. **Major pharmaceutical manufacturers pay Novation some of the highest "administrative/marketing fees"**

128. Pharmaceuticals are the largest product line in Novation's contract portfolio. Of Novation's 600 contracts, 275 or 46% are contracts with major pharmaceutical manufacturers for the sale of a wide array of pharmaceutical products. Relative to other manufacturers, pharmaceutical manufacturers also paid Novation some of the highest administrative/marketing fees. In addition to the two pharmaceutical manufacturers listed above (Nycomed, Inc. and Ben Venue Laboratories) as having paid 30% administrative/marketing fees, the following are examples of some of the other pharmaceutical manufacturers from whom Novation received illegal administrative/marketing fees: DuPont (Novation Contract No. RX64140) "NOVAPLUS® Dipyridamole," 25% administrative/marketing fee; Bristol-Myers Squibb (Novation Contract No. RX019) "Multisource Antibiotics," 18% administrative/marketing fee; Abbott Laboratories (Novation Contract No. RX80010) "Small Volume Injectibles Including Carpuject," 14.5% administrative/marketing fee; and Merck & Company (Novation Contract No. RX81080) "Cozaar, Fosamax, Hyzaar, Mefoxin, Mevacor, Pepcid, Primaxin, Prinivil, Proscar, Recombivax, Timoptic, Trusopt, Vasotec, Vaccines, Zocor," 20% administrative/marketing fee.

129. Relator has information and believes that Novation never disclosed to Novation Customers, as required by the safe harbor rules and regulation, the amount of the administrative/marketing fees that it has received and continues to receive from pharmaceutical companies.

**2.      Other excessive "administrative/marketing fees" paid by Becton Dickinson and Heritage Bag**

130.     Before awarding a contract, it was the customary practice of Novation's Senior Contract Managers to prepare an "Executive Summary" setting forth their recommendation on and supporting rationale for which vendor should receive the bid award. The Summary was distributed exclusively to top management at Novation, including the head of the Division in which the Senior Contract Manager worked and Novation's Vice-President, for their approval. At no time was the Executive Summary given to the Novation Customers.

131.     Once the contract was awarded, the Senior Contract Manager distributes a "Launch Packet" to the VHA and UHC Members announcing the recipient of the bid award, describing the supplies being offered and providing other information necessary for making purchases under the contract. At no time is any mention made of either Novation's receipt of or the amount of the "marketing fees" and other remuneration paid/to be paid to Novation by the successful vendors.

132.     Two Executive Summaries Novation prepared demonstrate Novation's and VHA's receipt of marketing fees well above 3% of total sales on four contracts.

133.     The Executive Summary for Contract No. MS8020B, "IV Catheters and Start Kits," was co-written by Relator and Sherry Woodcock and is dated October 30, 1998. The recipients include John Burks, Novation's former Head of Medical/Surgical Contracts, Mark McKenna, Novation's former Vice-President, and John Burks.

134.     The Executive Summary states that Becton Dickinson – the recommended bidder – has offered to provide Novation a marketing fee of 9% of total sales of the NOVAPLUS® products, Novation's private label brand. The Executive Summary was not disclosed to members or customers. After receiving approval for this recommendation from McKenna and Burks, the contract was awarded to Becton Dickinson under the terms of its bid, which included paying Novation a 9% marketing fee. Novation never informed the Novation Customers, either orally or in writing, of the amount of this marketing fee.

135.     In describing the marketing fee to be paid by Becton Dickinson, the author of the Executive Summary also notes that Becton Dickinson's 9% fee represented an increase of between 1 to 4% above the marketing fee VHA had received under its prior contract for "IV Catheters and Start Kits" of between 5 and 8%. Accordingly, as this document illustrates, before the advent of Novation, VHA had also been receiving marketing fees above the 3% threshold as part of the VHA contract for "IV Catheters and Start Kits" that preceded Novation Contract No. MS8020B. Relator has information and believes that neither VHA nor VHA Supply informed VHA Members, either orally or in writing, of the amount of this marketing fee.

136.     After its formation in January 1998, Novation experienced a transition period during which it phased out current VHA and UHC contracts and replaced them with new Novation contracts. With Contract No. MS80310, "NOVAPLUS® Can Liners," Novation sought to consolidate VHA and UHC's separate can liner contracts into a new Novation contract.

137.     An initial draft of the Executive Summary for Contract No. MS80310 was written by Relator. Relator recommended that Novation evaluate other can liner manufacturers as well as Heritage Bag because other bags were less expensive. The initial draft did not survive, however, and it was rewritten by Sherry Woodcock. The final version was dated December 8, 1998. Its recipients included Mark McKenna and John Burks. For the can-liner contract, Heritage Bag's "Supply Partner Contacts" to Novation were National Account Manager John Doyle and President Carl Allen, Jr., located in Grapevine, Texas.

138.     In the Executive Summary for this contract, the author recommended that the Novation contract – available to both VHA and UHC Members (and HPPI customers) – be awarded to Heritage Bag under the same terms as those in VHA Supply's current can-liner contract with Heritage Bag. Among the reasons cited for recommending Heritage Bag is that the marketing fee Heritage Bag was offering – 8.19% of total sales – is 6% higher than that being provided by UHC's supplier, Baxter Tennaco [sic], under UHC's contract. Heritage Bag's can-liner contract with VHA Supply is another example of VHA's receipt of illegal remuneration in exchange for a contract award.

139.     After receiving approval for this recommendation from John Burks and Mark McKenna, Novation awarded Contract No. MS80310 to Heritage Bag under the same terms as the contract with VHA, which included the payment to Novation of an 8.19% marketing fee. Novation did not inform the Novation Customers, either orally or in writing, of the amount of this marketing fee.

140.     The Executive Summary for Contract No. MS80310 also makes clear that, like Novation, VHA Supply had been receiving a marketing fee from Heritage Bag of 8.19% under its contract with Heritage Bag – the predecessor to Novation Contract No. MS80310. Relator has information and believes that VHA never disclosed to VHA Members, as required by the safe harbor rules and regulation, the amount of this marketing fee.

**3.      Remuneration received by Novation and VHA from vendors selling goods to hospitals participating in incentive programs**

141.     Novation offered an "Opportunity® Spectrum" program to induce members to commit to buy from Novation suppliers. The Novation Opportunity programs are governed by Novation's Opportunity® Spectrum I Portfolio Participation Agreements and Opportunity Spectrum II Portfolio Participation Agreements (the "Opportunity Agreements").

142.     Novation's Opportunity® program is a rebate program under which manufacturers and suppliers give members rebates for committing to buy a designated percentage of their product under a particular Novation contract. Most of Novation's contracts are included in the Opportunity™ portfolios and offer Opportunity® pricing/rebates. Novation uses fees paid by vendors to create a fund from which to give the rebates.

143.     Novation typically negotiates vendor fees as a percentage of hospital member purchases under a contract. For example, Becton Dickinson agreed to pay 8% of its revenue under the IV Catheters contract to Novation as part of the Opportunity® program. This payment was on top of the 9% marketing fee that Becton Dickinson had offered to pay to get the contract.

144.     The Opportunity Agreements require the participating hospitals to use Novation as its sole purchasing agent for the covered product categories. In fact, Novation prohibits

participating hospitals from soliciting rival bids, examining rival products, or even entertaining rival proposals.

145.    Novation created a document entitled "Frequently Asked Questions OPPORTUNITY Spectrum Portfolios."  The following question and answer appeared on page 2 under the heading "Incentive Payments":

> Question:  "Why is Novation not required to disclose specific amounts each supply partner contributes to the fund?"  [The "fund" is the money from which Novation pays rebates to the hospitals under this program.]
>
> Answer:  "The incentive is paid by Novation based on combined book of business."

146.    This question is revealing since it shows that Members have asked Novation to reveal payments made ***to Novation*** from suppliers and Novation has refused to do so.  While Novation's answer is a non sequitur, it implies Novation's position on this issue – the only payments Novation needs to disclose to the members are the rebate/incentive payments ***made to the hospitals***; it does not need to disclose payments ***to Novation*** from the suppliers.  Under the safe harbor, however, Novation can only choose not to disclose payments that are less than 3% of the contract amount.  As illustrated above, in the case of the IV Catheter contract, Novation failed to disclose a marketing fee of 9%.

147.    Relator also has information and believes that since 1995 Novation's predecessor VHA Supply routinely solicited and received marketing fees of at least 10% on its committed programs, including the "Opportunity I" and "Opportunity II" Programs.

148.    VHA Supply's "Opportunity" program required participating hospitals to increase purchasing levels across 13 product categories to 95%.  In other words, the hospital must purchase 95% of certain products from manufacturers selected by VHA.

149.    In return, VHA claimed to provide, among other things, "VHA's best contract pricing" and "cash rewards."  The cash rewards were given quarterly out of an "incentive fund." The incentive fund was paid for by participating manufacturers chosen by VHA.  Participation in

the program, according to VHA, ". . . could create an annual savings of 6 percent to 14% on purchases …."

150.    Nowhere did VHA disclose the total revenues given by manufacturers to VHA for the right to provide certain products to participating hospitals.  The Opportunity program, moreover, had onerous restrictions.  For example, hospitals were required to disclose their past and current purchasing history and "competitive data," to participate in certain other programs such as the VHA Pharmacy Program, and were prohibited from even entertaining proposals from other vendors or conducting product evaluations.

151.    In 1995, more than 560 organizations participated in the Opportunity program with a total committed volume of $450 million.  According to VHA, participating institutions realized approximately $61 million in annual savings.  VHA, however, never disclosed the total revenues given to VHA by manufacturers or those revenues not distributed to participants as a result of the program.

### 4.    Novation's preference for higher priced goods because they serve to increase its "administrative/marketing fees"

152.    By requiring that their administrative/marketing fees be expressed as a percentage of the total sales made under the contract (and routinely suggesting to bidders that the percentage should exceed 3%), Novation had an interest in awarding contracts to the bidder with the highest priced goods because higher prices yield higher marketing fees.  At all times relevant to this Complaint, Novation chose to award contracts to vendors offering the largest marketing fee (either by virtue of the percentage of sales, higher prices, or combination of the two) over competing vendors offering goods of comparable quality and lower prices than those of the chosen vendor.

153.    For example, during the summer of 2001, Novation issued an Invitation-to-Bid on a Novation contract to supply endo-mechanical products to its customers.  Among the vendors who submitted bids to Novation were defendant Johnson & Johnson and United States Surgical ("U.S. Surgical").  In its bid, U.S. Surgical offered the endo-mechanical products at prices significantly lower than those offered by Johnson & Johnson.  After performing market research,

Novation found U.S. Surgical's products were of comparable quality to that of Johnson & Johnson's. Despite the potential cost-savings to its customers, however, Novation awarded the contract to Johnson & Johnson.

154. Primary among Novation's reasons for choosing Johnson & Johnson over U.S. Surgical was the fact that U.S. Surgical's significantly lower prices would have greatly diminished the marketing fee that Novation would receive. Relator has information and believes that Novation never disclosed to Novation Customers, as required by the safe harbor rules and regulation, the specific details of the vendors' bids (including U.S. Surgical's significantly lower prices and comparable quality) or the real reason for its decision to choose Johnson & Johnson over U.S. Surgical – a feared reduction in its marketing fee.

C.     **Payments for Products Offered Under Novation's Private Label Brand, "NOVAPLUS®"**

155. As Senior Product Manager in Novation's Medical/Surgical Division, Relator was also responsible for increasing vendors' participation in Novation's private label brand program, NOVAPLUS®. NOVAPLUS® was an outgrowth of a similar private label program, VHA PLUS ("Prices Lowered Utilizing Standardization"), started by VHA Supply in the 1980s. Like VHA PLUS, the stated goals of NOVAPLUS® are to help the Novation Customers achieve cost savings and the benefits of product standardization by having vendors sell their products under Novation's private "NOVAPLUS®" label. In practice, however, NOVAPLUS® is simply another Novation scheme to generate more revenue without the knowledge of, and often at the expense of, the Novation Customers, whose interests it is supposed to serve.

156. Although made to sound like generics, the NOVAPLUS® products differ from generic products in a number of important ways. With generics, cost savings are achieved because a manufacturer is able to produce an equivalent product more cheaply than the name-brand manufacturer. However, neither Novation nor its predecessor VHA Supply manufactures any products. Instead, Novation (like VHA Supply before it) simply supplies the name. After manufacturing the products, the manufacturers simply affix the NOVAPLUS® label (in lieu of their own label) to their products. As explained in more detail below, rather than save

39

Novation's customers money, the addition of the NOVAPLUS® name does little more than create additional costs, such as "trademark and licensing" fees, that cause the prices of the NOVAPLUS® products to exceed those of the identical products without the NOVAPLUS® label.

157.     Rather than providing the Novation Customers with cost savings, Novation solicited vendors to sell their product under the NOVAPLUS® label at a price significantly *higher* than what they were offering for the same product under their own label.  For their participation in this scheme, Novation offered to share with the vendors a percentage of the profits gained by charging the Members the increased NOVAPLUS® price.  The higher costs for NOVAPLUS® products were paid by Novation Customers, and some of these costs were then reimbursed by the government.  By offering to market vendors' products at a higher price in exchange for selling the products under the NOVAPLUS® brand, and sharing the resulting profits, Novation provided remuneration to the vendors for providing supplies paid for in part by the government.  This is in illegal kickback.  As a result, claims for government reimbursement for these NOVAPLUS® products were false, and Novation caused the false claims.

158.     For instance, after Novation had received and opened bids on a recent contract for blood collection tubes, it approached Retractable Technologies Inc. ("RTI"), one of the bidders, about the possibility of selling its blood collection tube holder to Novation Customers under Novation's private "NOVAPLUS®" label.  Although, in its bid, RTI had offered to sell its tube holders for 27 cents per unit, Novation proposed that RTI could sell the same tube holders to Novation's customers for $1 per unit – a 270% mark-up – simply by changing the label to Novation's NOVAPLUS® brand.  In exchange for RTI's cooperation in this joint venture, Novation offered to share with RTI a percentage of the profits from the 270% mark-up.

159.     Although RTI rejected Novation's solicitation, Relator has information and believes that Novation consummated similar deals with other, less scrupulous vendors.  Relator has information and believes that Novation never informed the Novation Customers of the terms of these deals, including the fact that Novation had arranged to have vendors sell the

NOVAPLUS® products at prices higher than those charged for the same product without the NOVAPLUS® label and kept the profits.

160.     Another example of this is the Heritage Bag contract. One of the first medical/surgical contracts to which Relator was assigned in her position as Senior Contract Manager at Novation was Contract No. MS00210, a three-year contract for "NOVAPLUS® Can Liners." Under this contract, Novation was seeking a vendor to supply trash can liners to the Novation Customers under Novation's private label brand, NOVAPLUS®. This contract was the first can-liner contract put out for public competitive bid since Novation was formed. (Novation Contract No. MS80310, the predecessor to MS00210, was an interim contract under which Novation extended the terms of VHA Supply's previous can-liner contract to the UHC Members until the above-referenced contract could be awarded by public competitive bid.)

161.     Shortly after starting at Novation, Relator met with her supervisor Sherry Woodcock to discuss the contracts she had been assigned. When their discussions turned to Contract No. MS00210, "NOVAPLUS® Can Liners," Woodcock started to laugh and told Relator that this contract had always belonged to and would always belong to defendant Heritage Bag and that the last person who tried to remove it from Heritage Bag almost lost his job. When Relator asked why Heritage Bag deserved such special treatment, Woodcock replied that Heritage Bag was represented by John M. Doyle, the founder and former President of VHA Supply.

162.     At first, Relator tried ignoring the comment and went about the business of preparing to put the contract out for bid. Relator conducted some preliminary market research and discovered that at least three vendors had can liners with prices *lower* than Heritage Bag. During Relator's interviews with these vendors, each expressed surprise at her interest in their can-liners and stated that, since Heritage Bag has had VHA Supply/Novation's can-liner contract for the last 13 years, they had little hope of ever getting it away from Heritage Bag. In the meantime, Sherry Woodcock continued to make comments to Relator that the upcoming can-liner contract should be awarded to Heritage Bag.

41

163.     Increasingly concerned by these comments (particularly in light of her discovery that competitors' can liners were cheaper), Relator went to speak with Brad Mohler, the Novation contracting officer reputed to have almost lost his job for trying to wrest the can-liner contract away from Heritage Bag.  Mohler confirmed that the can-liner contract belonged to Heritage Bag because its representative, John M. Doyle, was the founder and former President of VHA Supply and advised Relator not to "rock the boat" (*i.e.*, recommend awarding the contract to another vendor) because "you cannot win."

164.     In December 1998, John M. Doyle, his son, and other representatives of Heritage Bag took Relator to dinner at Newport's Seafood in Dallas.  At this dinner, John Doyle asked Relator what its competitors were bidding on the upcoming can-liner contract and sought confirmation that, given its history with VHA Supply, Heritage Bag would, in fact, be awarded the contract.  When Relator refused to answer, stating that these were improper questions, Doyle's son became visibly angry, at which point John Doyle reassured him Heritage Bag had been around for a long time (as compared to Relator's short tenure at Novation) and that he would "take care of her [Relator]."

165.     Convinced by these events that Novation would reject her recommendation to award the Can-Liner Contract to any vendor other than Heritage Bag irrespective of a vendor's more competitive pricing, Relator informed her supervisor Sherry Woodcock – in front of the entire contracting staff of the Medical/Surgical Division (gathered at a holiday dinner) – that she no longer wanted to manage the Can-Liner Contract since she had been informed that she would be fired if she did not award it to Heritage Bag.  Woodcock agreed to take over the contract.

166.     Shortly after raising these (and other) concerns about Novation's contracting process and rebuffing John Doyle over dinner, Relator experienced a dramatic change in her work environment.  Among other things, where before she had received praise and camaraderie, she started receiving criticism about her work performance (including a detailed "performance improvement plan"), was alienated by her co-workers and quickly terminated.

167.     Despite the availability of lower-priced can liners, Novation awarded the Can-Liner Contract to Heritage Bag.  With the increased revenue, former President of VHA John Doyle receives a commission for every can-liner sold under the contract.  Heritage Bag won its first can-liner contract from VHA Supply shortly after John Doyle began work as its representative and has held the Can-Liner Contract uninterrupted over the succeeding 16 years while Doyle has continued as its representative.  Relator has information and believes that the basis for awarding Heritage Bag this and every other can-liner contract for the past 16 years awarded to it by VHA Supply was as a pay-off to John Doyle for his having agreed in 1986 to resign as President of VHA Supply amid accusations by three female employees of sexual harassment and sex discrimination.

168.     Relator has information and believes that neither Novation nor VHA has ever informed the Novation Customers of the commission payments to John Doyle for each can liner sold, the deal that VHA Supply struck with Doyle, Doyle's current ties to Heritage Bag and previous affiliation with VHA Supply, or the role these factors have played in guaranteeing Heritage Bag each of the can-liner contracts since 1986, despite the fact that there have been other bidders with less expensive can liners.  In its Launch Packet for the most recent contract, which was distributed to its customers, Novation failed to include among the reasons listed under "Award Rationale" for awarding Contract No. MS00210 to Heritage Bag either its commitment to Doyle or the existence of other vendors with prices lower than Heritage Bag.

169.     Novation's offering a higher price to Heritage Bag to sell its products under the NOVAPLUS® label, and sharing the resulting profits with Heritage Bag and Doyle, constitutes an illegal kickback.  This kickback does not fall within any safe harbor.  As a result, claims for government reimbursement for the cost of these can-liners are false, and Novation and Heritage Bag are liable for causing these false claims.

170.     Another example of Defendants' soliciting products for their own proprietary brands by offering to sell them at a higher price is the glove contract awarded to American Health Products ("AHP").  An authorized distributor for HPPI, United Medical Supply Co. Inc.,

distributed AHP's gloves to HPPI's customers in or about 1996 to 1999.  In 1999, the then-president and chief executive officer of United Medical Supply, William Bandy, advised Relator that its costs for a case of AHP gloves sold under the proprietary VHA label were $1 more than for a case of the same gloves sold under AHP's label.  Relator has information and believes, based on Novation's and VHA's offers to and relationship with Heritage Bag, John Doyle, and Retractible Technologies Inc., that VHA shared with AHP the revenues from the increased cost of AHP's gloves resulting from selling them under the its proprietary brand.  This constitutes a kickback not protected under any safe harbor, and VHA is liable for the false claims for government reimbursement of these kickback-tainted products.

171.    To participate in Novation's private label program and sell products under its NOVAPLUS® brand, manufacturers also are required to pay Novation a "trademark and licensing" fee.  Despite its name, the "trademark and licensing" fee is not a fixed fee that corresponds to the costs Novation will incur obtaining a trademark and license for a manufacturer's product.  Instead, like its "administrative/marketing" fees, Novation requires vendors to offer Novation a percentage of the total purchases of NOVAPLUS® products made by Novation's customers under the NOVAPLUS® contract.  The "trademark and licensing" fee is in addition to the "administrative/marketing" fee Novation charges.  By giving manufacturers the ability to name the amount of this fee, Novation encouraged manufacturers to bid up the percentage of total sales for which they were willing to provide as a trademark and licensing fee and routinely awarded the NOVAPLUS® contract to the highest bidder.  Like the mark-up described above, the costs of such "trademark and licensing" fees are built into the prices of the NOVAPLUS® products.  Therefore, contrary to their purported cost-savings benefits, the NOVAPLUS® products routinely are more expensive than identical products sold without the NOVAPLUS® label.

172.    Because these practices are so lucrative, Novation has been aggressive in trying to get manufacturers to agree to sell their products under the NOVAPLUS® brand.  In its Invitations-to-Bid on contracts, Novation informs prospective bidders that their willingness to

consider "a private label strategy under the NOVAPLUS label" is a plus factor that Novation will consider – along with other "Non-Financial Award Criteria" – in determining who will receive the bid award. However, Novation's internal documents show that a bidder's willingness to sell products under the NOVAPLUS® label is given much more weight in choosing the successful bidder. In a slideshow presentation to its Senior Product Managers describing Novation's "Supplier Selection Criteria," Novation includes "Private Label" in with Price, Marketing Fees, and Committed programs, as one of the Financial Criteria it will consider. As of September 28, 2001, Novation claimed to have 75 agreements with 42 vendors to sell products under the NOVAPLUS® label, representing $1.2 billion in annual sales.

**D.    Novation's Failure to Disclose Excessive Fees to Hospital Members and Customers**

173.    Novation never informed Novation Customers, either orally or in writing, of the amount of its marketing fees. Novation's method for communicating with members about new and existing contracts was to post the information on its website in a section accessible only to the members. The contract information Novation provided members takes four forms.

174.    The first form of communication is the ***Contract summary page***. For the "IV Catheter and Start Kits" contract, this page was entitled "Contract Details, MS80200, Novaplus Start Paks & IV Catheters," and it was the first page members would see on logging in and selecting the IV Catheter contract. This page did not transmit any information about fees. It contained links at the bottom of the webpage to the other three documents on Novation's website regarding the IV contract – (1) Launch Document; (2) Pricing History Report; and (3) Packaging Report.

175.    The second form of communication is the ***Launch Packet – Fact Sheet and Contract Summary***. The Launch Document for the IV Catheter contract is made up of two documents – (1) the "Fact Sheet"; and (2) the "Contract Summary." These documents summarize the contract terms. Therefore, any disclosures about fees/payments the vendor made or agreed to pay Novation in connection with this contract would appear here.

176.     As referenced above, Relator was the contract manager in charge of the IV Catheter contract.  In the Executive Summary explaining the basis for awarding the contract, the author[4] notes that Becton Dickinson had agreed to pay a 9% marketing fee.  Becton Dickinson also wrote Novation a $100,000 check in connection with this contract as a "marketing fee/sole award."  Although the incentive payments *to the hospital members* are described in excruciating detail in the Executive Summary, the fees or payments *to Novation* from Becton Dickinson, including the 9% fee and the $100,000 payment, are not disclosed in the Launch Packet documents (or any of the other member materials described herein).  Taken together, these documents illustrate that Novation did not disclose these payments to its hospital members as required by the safe harbor for fees above 3%.

177.     The third form of communication to members is the ***Pricing History Report***.  The Price History Report (entitled "Contract Information System, Line Item Price History Report") lists the three tiers of pricing available for each product covered under the contract.  The different tiers pertain to the level of commitment the member has chosen.  For instance, Tier 1 pricing might be for hospitals who have committed to buying 70% of their IV Start Kits and Catheters under this contract, whereas Tier 2 pricing is for hospitals with an 85% commitment level.  This document did not disclose the fees paid by Becton Dickinson for the contract, nor did it mention Becton Dickinson's $100,000 check.

178.     The fourth form of communication was the Packaging Report.  Relator has information and believes that the Packaging Report, as its title suggests, only tells members information like how many items are included per box.

## IX.     DAMAGES

### A.     Inflating Costs of Supplies Reimbursed by Government Health Insurance Programs

179.     In order to recoup the often considerable costs of paying Novation the kickbacks and other illegal remuneration described above, vendors built these costs into the prices they

---

[4] Although Relator is listed as the author of this document, every Executive Summary she wrote at Novation, including this, was thoroughly revised by her manager, Sherry Woodcock, before it was distributed to Novation management.

charge Novation's customers under the contracts for the supplies and services, thereby inflating the prices. A large percentage of these supplies and services are utilized in the treatment of beneficiaries of the government health insurance programs. The government reimburses health care providers for certain supplies based on cost reimbursement. The cost reimbursement calculations are included in cost reports filed annually with insurance companies the United Sates and Texas respectively have retained to act as their program fiscal intermediaries ("F.I.'s"). Under the federal cost-reporting regulations, there are several ways in which the vendors' inflated prices are borne by the government health insurance programs.

180.    First, several areas of a hospital, such as inpatient rehabilitation and psychiatric subproviders, are reimbursed by the government based on the actual costs incurred therein for treating  Medicare/Medicaid/CHAMPUS/TRICARE beneficiaries.  When a Novation Customer uses an overpriced supply/service (*i.e.*, one that includes the hidden costs of the Novation kickbacks) in one of these hospital areas, the inflated costs will cause a corresponding increase in the amount of the government's reimbursement to that customer.

181.    For the majority of the time relevant to this Complaint, the two types/areas of a health care provider that were reimbursed based on the actual costs incurred were distinct part units (subproviders) and outpatient ancillary cost centers.  As its name suggests, distinct part units are portions of the hospital (or free-standing facilities) that provide services that differ from the hospital's typical inpatient services.  The four most typical types of distinct part units are psychiatric units/hospitals, rehabilitation units/hospitals, skilled nursing facilities ("SNFs"), and home health agencies ("HHAs").  Like the hospital itself, distinct part units have their own Medicare provider number under which all Medicare/Medicaid/TRICARE/CHAMPUS billing is processed.  Hospitals include separate cost report line items and supplemental schedules on behalf of distinct part units.  Medicare began implementing Prospective Payment Systems for SNFs in 1998 for HHAs in 2000, and for rehabilitation centers in 2002.

182.    The majority of Novation's customers are either free-standing distinct part units or have distinct part units associated with their hospitals.  For instance, the 5,000 HPPI

customers are largely comprised of alternate care providers such as free-standing rehabilitation hospitals, psychiatric hospitals, SNFs, and HHAs. In addition, many of the 2,200 VHA and UHC Members, which consist largely of community and teaching hospitals, have distinct part units associated with their hospitals. Accordingly, distinct part units account for a large percentage of the $25 billion in total purchases that the Novation Customers make each year. Since the actual costs of the supplies and services purchased by these units are reimbursed in whole or part by the government health insurance programs, by causing vendors to inflate the prices for such goods/services, Defendants have caused the government to overstate its reimbursement to the large population of Novation and VHA customers with distinct part units, which has resulted in profound financial harm to the government health insurance programs.

183. The other primary area in which the government reimburses a health care provider based on actual costs incurred therein in treating Medicare/Medicaid/TRICARE/CHAMPUS beneficiaries is outpatient ancillary services. As its name suggests, these are areas of the hospital that provide outpatient services that are ancillary to the hospital's typical inpatient services. Cost report schedules identify the inpatient and outpatient charges separately for each ancillary cost center and additional cost report schedules compute the Medicare cost of each ancillary cost center by inpatient and outpatient services. Unlike distinct part units, however, ancillary services provided to outpatients are billed under the hospital's Medicare provider number and do not have their own provider numbers.

184. Examples of outpatient ancillary services are the Operating Room, Recovery Room, Radiology Department, Emergency Room, and Electrocardiogram Department. The 2,200 VHA and UHC Members, which consist largely of community and teaching hospitals, have several such ancillary cost centers in each of their hospitals. Although largely comprised of alternate care providers, some of the HPPI customers are traditional hospitals with the above-mentioned ancillary cost centers. During the relevant period Medicare reimbursed hospitals for outpatient ancillary costs on a cost-incurred basis. Beginning in 2000, Medicare has transitioned reimbursement of these costs to a prospective payment system. Since the actual costs of the

supplies/services purchased by these cost centers have been reimbursed in whole or part by the government health insurance programs, by causing vendors to inflate the prices for such goods/services, Defendants have caused the government to overstate its reimbursement to the many Novation Customers who have these cost centers, which has resulted in profound financial harm to the government health insurance programs.

185. Second, the overpriced supplies/services resulting from defendants' fraudulent practices also have served to improperly increase the amount of government reimbursement in areas of the hospital, like general acute care/Adults & Pediatrics, that are reimbursed under the "Prospective Payment System" or "PPS." Under PPS, the Medicare program uses payment schedules based on Diagnosis-Related Groups ("DRGs"), under which hospitals are paid pre-determined amounts for inpatient care in certain areas of the hospital based on the patients' diagnosis. The diagnosis-based DRG payments reflect the average costs an efficiently-run hospital would be expected to incur to treat such a patient. To determine the payment schedule that corresponds to each diagnosis, the government relies on pricing and other data from hospitals within the various geographic regions of the country as well as nationwide. Because Novation's 7,300 customers represent close to a third of the nation's health care providers, the government has necessarily relied on the inflated pricing information from many of Novation's customers in setting its DRG payments. Accordingly, the inflated prices incurred by the Novation Customers have, in turn, increased the amount of the DRG rate on which the government bases its reimbursement.

186. Third, for the majority of the time relevant to this Complaint, there was a category of products called "moveable capital equipment" that the government reimbursed based on the cost of the product, irrespective of the part of the hospital in which they were used. Examples of moveable capital equipment are ultrasound devices, CAT scanners, x-ray machines, hospital beds, and operating room tables. Capital equipment was one of Novation's primary product lines and Novation regularly negotiated capital-equipment contracts for its customers. As with Novation's other product lines, Relator has information and believes that several capital-

equipment vendors paid Novation kickbacks to obtain the contracts and increased the prices charged in Novation contracts for this equipment in order to recoup the illegal payments. Because such equipment was subject to cost-based reimbursement during the relevant period, the vendors' inflated prices on capital equipment also caused the government to overstate its reimbursement to the Novation Customers who purchased and later sought government reimbursement for the costs of this equipment.

187.    Fourth, another group of costs excluded from DRG-based reimbursement is outlier payments.  Outlier payments are additional payments for cases that are more complex than usual and thus more costly.  To qualify, they must meet or exceed a specific cost threshold. Medicare reimburses hospitals for outlier payments reported on their cost reports on a cost-incurred basis.  Because patients who generate outlier payments typically use the supplies and services for which Novation and VHA received kickbacks, outlier payments reported on the cost reports of Novation Customers were unlawfully inflated.  Medicare directly reimbursed these hospitals for such inflated outlier costs.

**B.      Specific Examples of Inflated Costs of Supplies Reimbursed by Government Health Insurance Programs**

188.    A Medicare Cost Report is an annual report that summarizes the provider's costs (expenses) and charges (revenue) by specific cost centers and reflects the Medicare portion of those costs.  The Medicare cost report additionally reconciles what the provider has already been paid for providing services throughout the year to what they should actually be paid based on the cost report findings.

189.    Below is a summary of where supply expenses are recorded and the reimbursement impact to Medicare based on the Medicare cost report of four hospitals:  Baylor University Medical Center for the period July 1, 2002 to June 30, 2003; Tucson Medical Center for the period January 1, 1998 to December 31, 1999; Scripps Mercy Hospital for the period October 1, 1999 to September 30, 2000; and Mobile Infirmary Medical Center for the period April 1, 1999 to March 31, 2000.  During this time, Baylor University Medical Center, Tucson

Medical Center, Scripps Mercy Hospital, and Mobile Infirmary Medical Center were VHA Members that would have purchased supplies through Novation.

190.     The analysis below specifically identifies inflated supply expenses for the following supplies:  (i) can-liners supplied by Heritage Bag; (ii) hypodermic needles and syringes, at least some of which were supplied by Becton Dickinson; (iii) standard and safety catheters and IV start kits, at least some of which were supplied by Becton Dickinson; and (iv) pharmaceutical products.

191.     The total cost of trash can-liners is recorded by the four medical centers identified above in the following cost centers on Worksheet A of the Medicare cost report:  Housekeeping (line 10), Laundry & linen (line 9), Dietary (line 11), and Cafeteria (line 12).  These cost centers are classified as overhead cost centers, which provide support to the revenue producing cost centers.  All overhead costs are allocated to the revenue producing cost centers on a statistical basis; this allocation is computed through the cost report schedules Worksheet B-1 and B part I. For example, the statistical basis used by Baylor University Medical Center is as follows: Housekeeping – square footage; Laundry – costed requisitions; Dietary – Meals Served; and Cafeteria – Employee FTE's.

192.     The cost of hypodermic needles and syringes is recorded in the cost centers Central Service and Supply (line 15) and/or Medical Supplies Charged to Patients (line 55) on Worksheet A of the Medicare cost report for Baylor University Medical Center, Scripps Mercy Hospital, and Mobile Infirmary Medical Center.  This cost is recorded only in the cost center Medical Supplies Charged to Patients (line 55) for Tucson Medical Center.  Central Service and Supply is an overhead cost center and thus all costs are allocated to revenue producing cost centers on a statistical basis.  For example, at Baylor University Medical Center, costs reported in the Central Service & Supply cost center were allocated based on costed requisitions.  Medical Supplies Charged to Patients is an ancillary revenue producing cost center which is distributed to exempt units and to the hospital inpatient and outpatient departments.

193.     The costs for IV standard and safety catheters and IV start kits are recorded in the cost center Central Service and Supply (line 15), IV Therapy (line 48), and/or Medical Supplies Charged to Patients (line 55) on Worksheet A of the Medicare cost reports of Baylor University Medical Center and Mobile Infirmary Medical Center.  For Scripps Mercy Hospital, these costs are recorded in the cost centers Central Services and Supply (line 15) and/or Medical Supplies Charged to Patients (line 55), and for Tucson Medical Center in the cost center Medical Supplies Charged to Patients (line 55).  As stated above, Central Service and Supply is an overhead cost center.  IV therapy and Medical Supplies Charged to Patients are categorized as ancillary, revenue-producing cost centers.  Ancillary costs and charges are reported on several cost reporting schedules and are distributed to exempt units and to inpatient and outpatient departments.

194.     The cost of pharmaceutical products is recorded in the cost center Pharmacy (line 16) and/or Drugs Charged to Patients (line 56) on Worksheet A of the Medicare cost reports of Baylor University Medical Center and Scripps Mercy Hospital.  They are recorded in the cost center Drugs Charged to Patients (line 56) on Worksheet A of the Medicare cost reports of Tucson Medical Center and Mobile Infirmary Medical Center.  The Pharmacy cost center is classified as an overhead cost center and thus all the costs are allocated to revenue-producing cost centers.  Drugs Charged to Patients is categorized as an ancillary, revenue-producing cost center.  Its costs are distributed to exempt units and to inpatient and outpatient departments.

195.     As explained above, the Medicare cost report is an important tool in determining Government reimbursement of providers.  Providers may recover for costs by reporting such costs for purposes of future reimbursements through the PPS system or by obtaining direct reimbursement for the costs of supplies and services.  Where these costs are inflated due to kickbacks, the Government will overpay providers both under the PPS system and the reimbursement system based directly on incurred costs.

196.     If costs of supplies are overstated either in an overhead cost center or in an ancillary cost center, it has a direct impact on the Medicare reimbursement for each distinct part

unit and outpatient cost center at the hospital. Each of these units is allocated overhead costs on a statistical basis and incurs ancillary services that are considered in determining the Medicare reimbursement.

197.     At Baylor University Medical Center, Tucson Medical Center, Scripps Mercy Hospital, and Mobile Infirmary Medical Center, the specific costs identified in paragraphs 190-194 above are reported in their cost reports on the lines identified in those paragraphs. Because these costs were inflated by Defendants' kickbacks as described in paragraphs 97-178 above, these costs were overstated.

198.     Each of the four hospitals identified above had exempt units (*i.e.*, subproviders) that were reimbursed on a cost basis (up to a limit) for the four categories of supplies identified above. For example, Baylor University Medical Center, Tucson Medical Center, Scripps Mercy Hospital, and Mobile Infirmary Medical Center all operate an exempt Inpatient Psychiatric Unit (line 31 of the Medicare cost report). Mobile Infirmary Medical Center also operates an exempt Inpatient Rehabilitation Unit. The Medicare reimbursement for exempt psychiatric and rehabilitation units is found on Worksheet D-1 (Sub-Provider – TEFRA). Additionally, Baylor University Medical Center operates organ acquisitions services that are reimbursed on a cost basis. Those organ acquisition units were a Lung Transplant Unit (line 85), a Heart Transplant Unit  (line 83), a Kidney Transplant Unit (line 82), a Liver Transplant Unit (line 84), and a Pancreas Transplant Unit (line 85.01). The Medicare reimbursement of these organ acquisition units is found on worksheet D-6 and combined on worksheet E part A line 12. Each of these lines on the cost report is inflated because of the four types of overstated costs identified above, and as a result Medicare paid the four hospitals costs that were not reimbursable.

199.     The cost reports for Tucson Medical Center and Mobile Infirmary Medical Center also indicate that they had outpatient ancillary services that were reimbursed on a cost basis. Medicare reimbursement for these outpatient ancillary services is reflected on Cost report Worksheet D part V and Worksheets E parts B, C, D, E. Each of these parts on the cost report is inflated because of the four types of overstated costs identified above, and as a result Medicare

paid Tucson Medical Center and Mobile Infirmary Medical Center costs that were not reimbursable.

200.　As stated above, Medicare pays providers for outlier costs on a cost-incurred basis.　The total outlier payment is found on worksheet E part A line 2.01 of the Medicare cost report of Baylor University Medical Center, Tucson Medical Center, Scripps Mercy Hospital, and Mobile Infirmary Medical Center.　This line on the cost reports is inflated because of the four types of overstated costs identified above, and as a result Medicare paid the four hospitals costs that were not reimbursable.

201.　Medicare recognizes that a provider may incur costs for items that are non-reimbursable for Medicare purposes and has provided a schedule (Worksheet A-8) where the provider can offset or reduce its total cost.　If a provider has received rebates or off-invoice discounts for supplies, they would be reported here.　Worksheet A-8 (specifically, Lines 6 and 7) of the Medicare cost reports of Baylor University Medical Center and Mobile Infirmary Medical Center does did not report any rebates or discounts.　Resulting overstated costs would have a direct impact on any of the cost-reimbursed units and on any outlier payments.

202.　In addition, Medicare considered the overstated costs identified in paragraphs 190-194 above in setting the four hospitals' future PPS reimbursement rates.　The hospitals' succeeding PPS payments calculated in part based on the supplies and services identified in paragraphs 97-178 above were overstated as a result of Defendants' kickbacks alleged above. As a result, Medicare paid Baylor University Medical Center, Tucson Medical Center, Scripps Mercy Hospital, and Mobile Infirmary Medical Center for costs that were not reimbursable.

## X.　EMPLOYMENT DISCRIMINATION FOR ACTS IN FURTHERANCE OF FALSE CLAIMS ACT ACTION

203.　Relator began working for Novation on July 27, 1998 as a Senior Product Manager for Medical/Surgical Products with an annual salary of $63,500.04.　From the beginning of her six months of employment at Novation until she started complaining to her superiors about the impropriety of the fraudulent practices described above, Relator was regularly commended by her superiors on her job performance.

54

204.    For instance, upon completion of one of her first assignments – putting out to bid and awarding Contract No. MS8020B, "IV Catheters and Start Kits" – Relator received a hand-written note from Novation's then President, James Hersma, complimenting her on her "[g]reat work."  As described above, this was also the contract pursuant to which Relator secured from Becton Dickinson a $100,000 "donation" to VHAseCURE.net.  For her work in obtaining this donation as well as a similar donation from another vendor, the Head of Novation's Information Technology Department (who oversaw the VHAseCURE.net program) sent Relator an e-mail congratulating her on her success and thanking her for her efforts.  A copy of this e-mail was also sent to John Burks, the former Head of the Medical/Surgical Products Division.

205.    By the end of 1998/beginning of 1999, as a result of the experiences described above, Relator had come to realize that the kickbacks and other illegal remuneration were not isolated indiscretions by a few rogue vendors but instead were part of a larger Novation scheme that pervaded its business.  Faced with two choices – play by Novation's rules and be complicit in fraud or refuse and try to effect change from within – Relator took the latter course.  As described above, she informed her supervisor Sherry Woodcock that she could no longer manage the can-liner contract because of the favoritism being shown to Heritage Bag, and she rebuffed Johnson & Johnson's attempts to pay Novation a kickback to obtain the IV Catheter Contract. Relator also raised her concerns about the impropriety of these practices with Novation senior management, including the Head of the Medical/Surgical Products Division, Human Resources staff, and Novation's in-house counsel.  Her concerns were largely ignored.

206.    Shortly after she took these corrective measures, Relator began to experience a dramatic change in her employment conditions.  Where previously she had been treated as part of the team, Relator now was being alienated by her co-workers.  For instance, Relator's administrative assistant, who had previously worked cooperatively with her (while also serving the other members of the Medical/Surgical contracting staff to whom she was jointly assigned), now refused to do any work for her.

207. Relator's supervisor Sherry Woodcock issued Relator a 6-page "Performance Improvement Plan" chronicling a laundry list of serious alleged lapses in her job performance and placing her on a 90-day probationary period. Although the vast majority of these alleged failings had supposedly occurred many months earlier, Relator had never before been informed of these "problems" and no reference to them had been made in her personnel file. Relator was hearing about them for the first time, *a matter of days* after she had first voiced concerns to management about Novation's contracting practices. Because of her supervisor's mischaracterization of the events described therein, Relator refused to sign the Performance Improvement Plan or agree to the conditions set forth therein. Fifteen days later, on February 5, 1999, Novation fired Relator for alleged problems related to her "performance/judgment."

208. As these circumstances clearly demonstrate, the reasons Novation gave for terminating Relator – "performance/judgment" – were a pretext. The real reason Novation fired Relator – as is belied by the close proximity between her complaints and Novation's belated criticism of her job performance – was in retaliation for her investigating and raising concerns about Novation's fraudulent contracting practices.

## XI. COUNTS

### COUNT I

### SUBSTANTIVE VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT

### [31 U.S.C. §§ 3729(A)(1), (A)(2), (A)(7) AND 3732(B)]

209. Relator realleges and incorporates by reference the allegations made in Paragraphs 1 through 125 of this Complaint.

210. This is a claim for treble damages and forfeitures under the Federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, as amended.

211. Through the acts described above, defendants knowingly caused Novation Customers to present to the United States Government, through the Medicare, Medicaid, and TRICARE/CHAMPUS programs, false and fraudulent claims, records, and statements for

reimbursement for health care supplies and services provided under Medicare, Medicaid, and TRICARE/CHAMPUS.

212.    Through the acts described above and otherwise, defendants knowingly caused the Novation Customers to make or use false records and statements, which also omitted material facts, in order to induce the United States Government and its F.I.'s to approve and pay such false and fraudulent claims.

213.    Through the acts described above and otherwise, defendants knowingly caused the Novation Customers to make or use false records and statements to conceal, avoid, and/or decrease the Novation Customers' obligation to repay money to the United States Government that the defendants improperly and/or fraudulently received.  Defendants also failed to disclose to the United States Government and its F.I.'s material facts that would have resulted in substantial repayments by the Novation Customers to the federal government.

214.    The United States, through the Medicare, Medicaid, and TRICARE/CHAMPUS programs and their respective F.I.'s, unaware of the falsity of the records, statements, and claims made or submitted by the Novation Customers, paid and continue to pay the Novation Customers for claims that would not be paid if the truth were known.

215.    The Medicare, Medicaid, and TRICARE/CHAMPUS programs and their respective F.I.'s, unaware of the falsity of the records, statements, and claims made or submitted by defendants and the Novation Customers – or of defendants' failure to disclose material facts that would have reduced government obligations – have not recovered Medicare, Medicaid, and TRICARE/CHAMPUS funds that would have been recovered otherwise.

216.    By reason of the defendants' false records, statements, claims, and omissions and defendants' misconduct in causing the Novation Customers to make and submit false records, statements, claims and omissions, the United States has been damaged in the amount of many millions of dollars in Medicare, Medicaid, and TRICARE/CHAMPUS funds.

## COUNT II

## FEDERAL FALSE CLAIMS ACT CONSPIRACY

### [31 U.S.C. §§ 3729(A)(3) AND 3732(B)]

217.    Relator realleges and incorporates by reference the allegations made in Paragraphs 1 through 133 of this Complaint.

218.    This is a claim for treble damages and forfeitures under the Federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, as amended.

219.    Through the acts described above and otherwise, defendants entered into a conspiracy or conspiracies with each other and with unnamed co-conspirators to defraud the United States by getting false and fraudulent claims allowed or paid.  Defendants have also conspired with each other and with unnamed co-conspirators to omit disclosing or to actively conceal facts which, if known, would have reduced government obligations to the Novation Customers or resulted in repayments from the Novation Customers to government health insurance programs.  Defendants have taken substantial steps in furtherance of those conspiracies, *inter alia*, by soliciting, accepting, offering or paying kickbacks and other monies from vendors as payment for awarding them Novation contracts knowing that these activities increased the cost of supplies and services ordered by the Novation Customers under these contracts and caused Novation's customers to submit false bills, cost reports and other records to the government and its F.I.'s for payment or approval that contained these improper costs, and by directing their agents and personnel not to disclose and/or to conceal their fraudulent practices or those of their co-defendants, as well.

220.    The Medicare, Medicaid, and TRICARE/CHAMPUS programs and their respective F.I.'s, unaware of defendants' conspiracies or the falsity of the records, statements and claims caused to be made by defendants and made by the Novation Customers, and as a result thereof, have paid and continue to pay millions of dollars in Medicare, Medicaid, and TRICARE/CHAMPUS interim and final reimbursement that they would not otherwise have paid.  Furthermore, because of the false records, statements, claims, and omissions caused to be

made by defendants and made by the Novation Customers, the United States has not recovered Medicare, Medicaid, and TRICARE/CHAMPUS funds from the Novation Customers that otherwise would have been recovered.

221.    By reason of defendants' conspiracies and the acts taken in furtherance thereof, the United States has been damaged in the amount of many millions of dollars in Medicare, Medicaid, and TRICARE/CHAMPUS funds.

## COUNT III

## SUBSTANTIVE VIOLATIONS OF THE TEXAS MEDICAID FRAUD PREVENTION ACT

### [Texas Human Resources Code §§ 36.002 (1)(A), (2)(B) & (4)(B)]

222.    Relator realleges and incorporates by reference the allegations made in Paragraphs 1 through 138 of this Complaint.

223.    This is a claim for civil remedies and civil penalties under the Texas Medicaid Fraud Prevention Act, Texas Human Resources Code, §§ 36.001 *et seq.*

224.    Through the acts described above, defendants knowingly have caused the Novation Customers to present to the Texas Medicaid program and its F.I.'s false and fraudulent claims, records, and statements for reimbursement for health care supplies and services provided under Medicaid.

225.    Through the acts described above and otherwise, defendants knowingly made, used, and/or caused the Novation Customers to make or use false records and statements, which also omitted material facts, in order to induce the Texas Medicaid program and its F.I.'s to approve and pay such false and fraudulent claims.

226.    Through the acts described above and otherwise, defendants knowingly made, used, and caused the VHA and UHC Members to make or use false records and statements to conceal, avoid, and/or decrease the Novation Customers' obligation to repay money to the Texas Medicaid program and its F.I.'s that the Novation Customers improperly and/or fraudulently received.  Defendants also failed to disclose to the Texas Medicaid program and its F.I.'s

material facts that would have resulted in substantial repayments by the Novation Customers to the Texas government.

227.     The Texas Medicaid program and its F.I.'s, unaware of the falsity of the records, statements, and claims made or submitted by defendants and the Novation Customers, paid and continue to pay the Novation Customers for claims that would not be paid if the truth were known.

228.     The Texas Medicaid program and its F.I.'s, unaware of the falsity of the records, statements, and claims made or submitted by defendants or the Novation Customers – or of their failure to disclose material facts which would have reduced government obligations – have not recovered Medicaid funds that would have been recovered otherwise.

229.     By reason of the defendants' false records, statements, claims, and omissions and defendants' misconduct in causing the Novation Customers to make or submit false records, statements, claims, and omissions, the State of Texas and the Texas Medicaid program have been damaged in the amount of many millions of dollars in Medicaid funds.

## COUNT IV

## TEXAS MEDICAID FRAUD PREVENTION ACT CONSPIRACY

### [Tex. Human Resources Code § 36.002(9)]

230.     Relator realleges and incorporates by reference the allegations made in Paragraphs 1 through 146 of this Complaint.

231.     This is a claim for restitution, double damages and penalties under the Texas Medicaid Fraud Prevention Act, Texas Human Resources Code §§ 36.001 *et seq*.

232.     Through the acts described above and otherwise, defendants entered into a conspiracy or conspiracies with each of the other defendants and with unnamed co-conspirators to defraud the Texas Medicaid program by getting false and fraudulent claims allowed or paid. Defendants have also conspired with each other and with unnamed co-conspirators to omit disclosing or to actively conceal facts which, if known, would have reduced the Texas Medicaid program's obligations to the Novation Customers or resulted in repayments from the Novation

Customers to the Texas Medicaid program. Defendants have taken substantial steps in further-ance of those conspiracies, *inter alia*, by soliciting, accepting, offering or paying kickbacks and other monies from vendors as payment for awarding them Novation contracts knowing that these activities increased the cost of supplies and services ordered by the Novation Customers under these contracts and caused Novation's customers to submit false bills, cost reports and other records to the Texas Medicaid program and its F.I.'s for payment or approval that contained these improper costs, and by directing their agents and personnel not to disclose and/or to conceal their fraudulent practices or those of their co-defendants, as well.

233.    The Texas Medicaid program and its F.I.'s, unaware of defendants' conspiracies or the falsity of the records, statements and claims caused to be made by defendants and made by the Novation Customers, and as a result thereof, have paid and continue to pay millions of dollars in Medicaid interim and final reimbursement that they would not otherwise have paid. Furthermore, because of the false records, statements, claims, and omissions caused to be made by defendants and made by the Novation Customers, the Texas Medicaid program has not recovered Medicaid funds from the Novation Customers that otherwise would have been recovered.

234.    By reason of defendants' conspiracies and the acts taken in furtherance thereof, the State of Texas and the Texas Medicaid program have been damaged in the amount of many millions of dollars in Medicaid funds.

**COUNT V**

**FEDERAL FALSE CLAIMS ACT – EMPLOYMENT DISCRIMINATION**

**[31 U.S.C. § 3730(h)]**

235.    Relator realleges and incorporates by reference the allegations made in Paragraphs 1 through 151 of this Complaint.

236.    This is a claim for damages under the Federal False Claims Act, 31 U.S.C. § 3730(h).

237.     Through the acts described above and otherwise, defendant Novation discriminated against Relator in the terms and conditions of her employment at Novation by, among other things, terminating her employment.  Novation's stated reasons for terminating Relator regarding deficiencies in her job performance were baseless and simply a pretext for the real reason for her termination – to retaliate against Relator for her investigation of defendants' fraudulent practices in preparation for filing the above-captioned False Claims Act lawsuit.

238.     By reason of defendant Novation's actions, Relator has been damaged in the amount of many thousands of dollars.

**COUNT VI**

**TEXAS MEDICAID FRAUD PREVENTION ACT – EMPLOYMENT DISCRIMINATION**

**[Texas Human Resources Code § 36.115]**

239.     Relator realleges and incorporates by reference the allegations made in Paragraphs 1 through 155 of this Complaint.

240.     This is a claim for damages under the Texas Medicaid Fraud Prevention Act, Texas Human Resources Code § 36.115.

241.     Through the acts described above and otherwise, defendant Novation discriminated against Relator in the terms and conditions of her employment at Novation by, among other things, terminating her employment.  Novation's stated reasons for terminating Relator regarding deficiencies in her job performance were baseless and simply a pretext for the real reason for her termination – to retaliate against Relator for her investigation of defendants' fraudulent practices in preparation for filing the above-captioned False Claims Act lawsuit.

242.     By reason of defendant Novation's actions, Relator has been damaged in the amount of many thousands of dollars.

**PRAYER**

WHEREFORE, Relator prays for judgment against defendants as follows:

A.     That defendants cease and desist from violating 31 U.S.C. §§ 3729 *et seq.* and Texas Human Resources Code  §§ 36.001 *et seq.*;

B.     That the Court enter judgment against defendants in an amount equal to three times the amount of damages the United States has sustained as a result of defendants' actions in violation of the Federal FCA, plus interest, as well as a civil penalty against each defendant of $11,000 for each violation of 31 U.S.C. § 3729;

C.     That the Court enter judgment against defendants in an amount equal to  three times the amounts paid by the Texas Medicaid program as a result of defendants' actions in violation of the Texas Medicaid Fraud Prevention Act, plus interest, as well as a civil penalty against each defendant of $10,000 for each violation of Texas Human Resources Code § 36.052(3), and the attorney's fees, expenses and costs of the Texas Attorney General.

D.     That Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) and Texas Human Resources Code § 36.110;

E.     That Relator be awarded all costs and expenses of this action, including attorneys' fees;

F.     That the Court enter judgment against defendant Novation as a result of its actions in violation of 31 U.S.C. § 3730(h) and Texas Human Resources Code § 36.115 as well as all relief necessary to make Relator whole, including reinstatement with the same seniority status Relator would have had but for the discrimination, not less than two times the amount of back pay,  interest on back pay, and compensation for any special damages sustained as a result of Novation's employment discrimination, including litigation costs and reasonable attorney's fees; and

G.     That the United States, the State of Texas, and Relator receive all such other relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands trial by jury.

Dated:  December 21, 2007                    Respectfully submitted,


                                             By s/Robert J. Hill
                                                    Robert J. Hill
                                                    Bar Card No. 09652100
                                             CLAXTON & HILL
                                             3131 McKinney Ave., Ste. 700
                                             Dallas, TX  75204-2471
                                             (214) 969-9029
                                             Facsimile: (214) 953-0583


                                             HAGENS BERMAN SOBOL SHAPIRO LLP
                                             Steve W. Berman
                                             Jeffrey T. Sprung
                                             Leonard Aragon
                                             1301 Fifth Ave., Ste. 2900
                                             Seattle, WA 98101
                                             (206) 623-7292

                                             PHILLIPS & COHEN LLP
                                             Mary Louise Cohen
                                             Peter Chatfield
                                             Mary A. Inman
                                             131 Steuart St., Ste. 501
                                             San Francisco, CA 94105
                                             (415) 836-9000


                                             Attorneys for *Qui Tam* Plaintiff/Relator
                                             Cynthia I. Fitzgerald

## CERTIFICATE OF SERVICE

I hereby certify that on this 21ˢᵗ day of December, 2007, I electronically filed the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. The electronic case filing system sent a "Notice of Electronic Filing" to the following attorneys of record who have consented in writing to accept this notice as service of this document by electronic means:

William D. Sims (bsims@velaw.com)
Veronica S. Lewis (vlewis@velaw.com)
Vinson & Elkins, LLP
2001 Ross Avenue, Suite 3700
Dallas, Texas 75201

Trevor R. Jefferies (trjefferies@hhlaw.com)
Kent A. Radford (karadford@hhlaw.com)
Hogan & Hartson, LLP
711 Louisiana, Suite 2100
Houston, Texas 77002

Sean R. McKenna
(sean.mckenna@usdoj.gov)
Assistant United States Attorney
1100 Commerce Street, Third Floor
Dallas, Texas 75242

Susan Jean Miller
(susan.miller@oag.state.tx.us)
Assistant Attorney General
Anti-Trust and Civil Medicaid Fraud
Division
PO Box 12548
Austin, Texas 78711-2548

Glen Grossenbacher (gglaw@swbell.net)
Law Office fo Glenn Grossenbacher
1800 McCullough
San Antonio, Texas 78212

Jonathan B. Skidmore
(jskidmore@fulbright.com)
Fulbright & Jaworski
2200 Ross Avenue, Suite 2800
Dallas, Texas 75201

H. Campbell Zachry (czachry@hunton.com)
Melissa J. Swindle
(mswindle@hunton.com)
Hunton & Williams, LLP
1445 Ross Avenue, Suite 3700
Dallas, Texas 75202

L. James Berglund, II
(james.berglund@tklaw.com)
Jason Murray Davis
Jennifer E. Rudenick
(jennifer.rudenick@tklaw.com)
Thompson & Knight
1700 Pacific Ave., Suite 3300
Dallas, Texas 75201

Brian A. Colao (colaob@gtlaw.com)
Hugh E. Hackney (hackneyh@gtlaw.com)
Greenberg Traurig
2200 Ross Avenue, Suite 5200
Dallas, Texas 75201

Larry E. Cotton (lcotten@cottenschmidt.com)
Angela R. Hoyt (ahoyt@cottenschmidt.com)
Cotten Schmidt - Fort Worth
420 Throckmorton Street, Suite 500
Fort Worth, Texas 76102

William Trey C. Dowdy, III
(trey.dowdy@strasburger.com)
Strasburger & Price
901 Main Street, Suite 4400
Dallas, Texas 75250

Christopher S. Maynard
(csmaynard@jonesday.com)
Jones Day
2727 N. Harwood Street
Dallas, Texas 75201

John Clark (clark@goodelaw.com)
Goode Casseb Jones Riklin Choate & Watson
2122 N. Main Avenue
San Antonio, Texas 78212

Thomas N. Tarnay (ttarnay@sidley.com)
Sidley Austin Brown & Wood
717 N. Harwood Street, Suite 3400
Dallas, Texas 75201

Darren L. McCarty
(daren.mccarty@alston.com)
Alston & Bird, LLP
2200 Ross Avenue, Suite 4650W
Dallas, Texas 75201

      I further certify that a true and correct copy of the foregoing document was sent by first class mail to counsel listed below that have not consented in writing to accept this notice by electronic means:

      Mary A. Inman
      Michael Brown
      Phillips & Cohen, LLP
      131 Steuart Street, Suite 501
      San Francisco, CA 94105

                  s/Robert J. Hill
                  Robert J. Hill